179 So. 591

**STATE v. GOODWIN.**

No. 34613.

Feb. 7, 1938.

Rehearing Denied March 7, 1938.

J. Bernard Cocke, of New Orleans, for appellant.

Gaston L. Porterie, Atty. Gen., James O'-Connor, Asst. Atty. Gen., and Charles A. Byrne, Dist. Atty., and Conrad Meyer, Jr., Sidney A. Mitchell, and Albert B. Granzin, Jr., Asst. Dist. Attys., all of New Orleans, for the State.

HIGGINS, Justice.

The defendant was indicted for the murder of his wife on April 27, 1936. He was tried twice, the first trial resulting in a mistrial, and, on the second one, he was found guilty of manslaughter. The court sentenced him to serve a term of not less than five nor more than fifteen years at hard labor in the State Penitentiary. He appealed from the verdict of the jury and the sentence of the court and relies for reversal thereof on seventeen bills of exception.

In order that a number of the issues raised by the bills may be more clearly under-

stood, it is necessary to state the facts of the case:

The defendant was a member of the New Orleans police force for nearly fourteen years, at the time of the tragedy. He had been married twice. After a divorce, he married the deceased, Barbara Sanderson Goodwin. Because of domestic troubles, the couple separated and consulted an attorney about a divorce. They sold their household effects, the proceeds of which were given to the wife for the purpose of taking a business course so that she could secure employment. She was residing with their friends, Mr. and Mrs. Henry E. Bazajou, for about eleven days prior to the tragedy and during that period of time the defendant had not called to see her.

On April 27, 1936, about 12 o'clock midnight, defendant went in his car to the residence of his wife, No. 8613 Jeanette street. In response to his knocks, Mrs. Bazajou admitted him and summoned his wife, who was asleep in the front bedroom. After slipping on a kimono, she joined her husband in the living room. A few moments later, Mr. and Mrs. Bazajou heard a noise, Mrs. Goodwin shouted, "Don't," and a shot was fired. Mrs. Goodwin then immediately ran from the living room through a small hall through Mr. and Mrs. Bazajou's bedroom, through the kitchen to the back porch and then into the back yard, screaming, "help me, help me." She was pursued by her husband, who held a revolver in his right hand, and who said to her, "Why didn't you meet me?" A few moments later, the deceased, accompanied by the defendant, returned to the kitchen with blood

stains on her garments and requested Mrs. Bazajou to do something for her. Mrs. Bazajou was in a delicate condition, and she and her husband became frantic. They took their small child and left the house and, with the assistance of neighbors, summoned the police and an ambulance, which arrived about 12:30 o'clock a. m.

The police found Goodwin sitting on the floor beside his wife in Mr. and Mrs. Bazajou's bedroom. He admitted to several of the policemen that he shot his wife because she had disappointed him in failing to keep an appointment and refusing to reconcile with him. He told them where they could find the gun in the back yard. He also stated that, if one of the cartridges had not failed to explode, he would have killed himself. He cried and became hysterical as his wife was being taken out of the house to the ambulance, realizing that she was dead. About 2 o'clock a. m. he admitted to the assistant district attorney that he had shot her and, also, about 5 o'clock the same morning, he told a newspaper reporter that he shot his wife because "I couldn't take it, my mind or my brain, or something seemed to snap."

The State's theory of the case was that the defendant, with malice aforethought, went to his wife's residence for the purpose of killing her and carried out his designs.

The defendant testified that he had an appointment with his wife downtown, which she failed to keep; that he waited in front of the picture show where he was supposed to meet her until about 10 o'clock p. m., and then went to the home of one of his friends where he stayed for some time, and later

drove his automobile to his wife's residence, because he was worried about her. He says that it was his intention to try to effect a reconciliation with her and that when she told him that she no longer loved him, that she was no longer interested in him, and that she did not need him, he was so overwhelmed by her attitude and statements that he got up from the sofa where they were sitting, drew his .38-caliber Smith and Wesson revolver and placed it to his head, saying that he had given her everything and might as well give her his life; that she suddenly jumped up and shouted "don't," grabbing his arm, when the revolver exploded; that she immediately ran from the room and that he followed her to see if she had been hurt; that when he overtook her in the back yard she apprised him that she had been shot and he said, "My God, I did not mean to shoot you"; that he then assisted her into the house and awaited the arrival of the police. His defense, therefore, was that she had been accidentally killed.

 Bill of exception No. 1 was reserved by the defendant to the judge's ruling in permitting the court and the jury to repair to the residence of Sergeant J. H. Schmid, a State witness, who was confined to his bed and unable to leave his home, for the purpose of taking his testimony.

Counsel for the defendant objected to the court or the jury leaving the court building or courtroom, section B of the criminal district court for the parish of Orleans, for the following reasons:

"1. That the Constitution of Louisiana provides that the Criminal District Court for the Parish of Orleans shall be composed of five judges, who shall hold court in one building, and that the only building provided for by the City of New Orleans is the Criminal District Court in which this courtroom is located; that to take this jury out to hear the witness to whose home we are expected to repair would be a useless, dangerous procedure in exposing this jury in violation of this defendant's constitutional rights;

"2. That this same witness, Sergeant Schmid's testimony was taken in the first trial of this case some five weeks ago, and the witness in addition thereto cross-examined; that at the time this case was fixed for trial on Monday, April 12, at 10:30 a. m., counsel for the State knew that this witness was ill and could not appear in Court, and, for that reason, should have requested a continuance."

The pertinent part of section 82 of article 7 of the Constitution of 1921 reads as follows:

"There shall be five separate sections of said Criminal District Court for the parish of Orleans, each presided over by one of said judges. All of said judges shall hold court in one building to be provided by the City of New Orleans."

While the above language requires the judges of the criminal district court of the parish of Orleans to hold court in one building, it is not expressly stated that this shall be the sole and exclusive place where the judges shall hold court, regardless of circumstances and conditions. For instance, if the courthouse were to burn, could it be said

that the judges were powerless to open court in another building? Surely, the framers of the Constitution did not intend to announce a hard and fast rule that was rigid and inflexible, as far as the place of holding court was concerned. In the absence of any language to the contrary, it is our opinion that the above provision must be interpreted reasonably and fairly. To hold that this language was a prohibition against the jury and the court going to the locus in quo of the crime and there viewing the scene and hearing evidence, or going to the residence or a hospital where a material and important witness was confined to his bed, in order to take his testimony either for the State or the accused, would, in our opinion, be placing a harsh and drastic construction upon this provision of the Constitution. The purpose of a trial is to do justice between the State and the accused. The law is not interested in helping a guilty party escape just punishment nor in punishing an innocent person. Therefore, the court must have the facilities by which the truth can be ascertained, in order to mete out justice.

Chamberlayne, in his work "The Modern Law of Evidence," in dealing with the subject matter of the administrative power of the court, in volume 1, page 218, paragraph 172, says:

"Equally within the judicial function of the court with the enforcement of law * * * is the promotion and furtherance of justice. This is the field of judicial administration. The primary mandate of the judge is to promote justice."

To demonstrate that it is indispensable for the trial judge or court to have some latitude in a matter of this kind, take a case where the accused, with due diligence, properly had his two principal witnesses summoned, and, after the State had placed its case before the jury, these two witnesses, while the court recessed for lunch, were fatally injured in a traffic accident and were immediately removed to the hospital where the attending physician stated it was impossible for them to live. It would be impossible to postpone the case, and, if the court, under the interpretation contended for by the defendant, was powerless to repair to the hospital for the purpose of taking these witnesses' testimony, a terrible injustice might result. Of course, if the rule must be extended for the benefit of one accused of crime in order to enable him to present his defense, then it is equally imperative that the State have the same facilities in the prosecution.

We endeavored to make this clear in the recent case of State v. O'Day, 188 La. 169, 175 So. 838, where the identical point here raised was decided. Although the soundness of that case has been attacked, we see no reason to change our views.

In the instant case, it was clearly demonstrated that the witness was a material one and that he was so ill that he was unable to come to court. It was only after these facts were established that the trial judge ruled that the State was entitled to have the court and the jury repair to the witness' residence for the purpose of taking his testimony.

█ Counsel for the defense says that the trial judge abused his discretion in making his ruling because the witness' testimony had already been taken in the previous trial, and 'that on the day the case was fixed for hearing the State knew that the witness was too ill to appear in court and for that reason the defendant suggested a continuance.

Article 155 of the Louisiana Criminal Code of Procedure provides:

"The deposition of the accused * * * and of any witness, whenever it shall be shown that such witness is * * * too ill to testify, * * * shall be received in evidence upon the trial of the case or in any subsequent judicial proceeding."

In the instant case, the witness was not too ill to testify, but was too ill to attend court. Therefore, this article would not have given the State the right to introduce Sergeant Schmid's previous testimony.

To show that 'the assistant district attorney acted with foresight in refusing the suggestion that the case be continued until Sergeant Schmid could attend court, we merely have to state that Sergeant Schmid died three days after the trial. Had the case been postponed, the State would have been deprived of his testimony.

The defendant in no way points out where his rights were in any manner jeopardized or prejudiced by the court and the jury going to Sergeant Schmid's home. It appears that everything was done in regular and legal order and that the accused's rights were in every way protected. Every precaution to guard against corrupting the jury was also taken. Counsel for the defendant's whole argument is predicated upon what might have happened. In order to complain, he must show that something did occur that deprived him of a substantial right or prejudiced his case. This he has signally failed to do.

█ Bill of Exception No. 2. The assistant district attorney, in behalf of the State, having moved the court to repair with the jury to the home of Sergeant Schmid for the purpose of taking his testimony at his bedside and, the defendant having objected, the trial judge, in the presence of the jury, in passing upon the legal question presented, said:

"The Court. This is a serious case. A man's life is involved. The State is interested in the prosecution of the case. The witness is a necessary witness. Upon a doctor's certificate, we are positive he is confined to his home and the only way possible to obtain his testimony would be to repair to his home and examine him as a witness there, etc., etc.

"Mr. Cocke: If your Honor please, I didn't want to interrupt your Honor because your Honor started to speak. Counsel for the defendant objects to the statement made by the Court and taken down by the stenographer that 'this is a serious case,' for the reason that counsel for the defendant and the defendant contend that this is a comment upon the facts of the case; that the Court has no right in law to comment upon the facts of the case in the presence of the jury, or to give his opinion in any manner, shape or form as to whether the case be

serious or not. The counsel for the defense and the defendant now asks that this Court direct a mis-trial by reason of the words used by the Court in giving the Court's appreciation of this case.

"The Court. Which motion the Court overrules." (Page 255, Tr.)

Counsel for the defendant argues that under the article of the Constitution and article 384 of the Code of Criminal Procedure, the jurors are the judges of the facts of the case and alone have the right to determine the weight and the credibility to be given to evidence, and that the trial judge has no right to comment upon the facts of the case.

In his per curiam, our learned brother below states that the only question before the court was the legality of the court and the jury leaving the regular court room for the purpose of hearing the disabled witness' testimony; that, in order to make his ruling, it was necessary to state that the case was a serious one and the witness a necessary one, otherwise the judge would be abusing his discretion in ordering the jury and the court to leave its regular quarters. He states that he had no intention of commenting upon the facts of the case, the weight or the sufficiency of the evidence, the credibility of the witness or the guilt or innocence of the accused, and that the court was satisfied that no such impression was conveyed to the jury.

The jury knew that the case was a serious one, because the accused was charged in an indictment with murder. After hearing the witness' testimony, it was obvious he was a necessary one. The words of the court were confined to the legal question presented and by no stretch of the imagination could be considered a comment upon the weight of the evidence or the credibility of the witness, or a comment upon the facts, because his testimony at that time had not been taken. Furthermore, the remarks of the trial judge were addressed to defendant's counsel on a legal question and not to the jury and in no way were related to the guilt or innocence of the accused. It is our opinion that this bill is without merit. State v. Covington et al., 169 La. 939, 126 So. 431; State v. Pascal, 147 La. 634, 85 So. 621.

Bill No. 3. Bill of Exception No. 3 was reserved under the following circumstances:

"Mr. Meyer: Q. Now, you said that Mrs. Goodwin had a black eye and some injury to her side?

"A. Yes, Sir.

"Q. Just answer this question Yes or No—

"Mr. Cocke: Just a minute; if your Honor pleases the gentleman on the other side presupposes that an objection is going to be made. Now, there is such a thing as asking questions which give the impression of what the answer would be in the event an objection is made. Now, let us come up to your Honor and put it up to your Honor, or retire the jury and let counsel ask the question out of the presence of the jury.

"(Both counsel confer with the Court at the bench.)

"The Court: I will hear the question.

"Mr. Meyer: Q. Now, Mrs. Bazajou, when Mrs. Goodwin came up there and testified as to her condition, did Mrs. Goodwin—don't answer this just listen and leave Mr. Cocke object, and, when the Judge tells you to answer then you answer. When Mrs. Goodwin came up there to live with you and you saw her physical condition, did she tell you how she received those injuries?

"Mr. Cocke: I object, if your Honor please, I say that the question is absolutely irrelevant and immaterial, and I ask your Honor to instruct the jury to disregard any impression that might flow from the very question itself.

"The Court: I am going to rule that she can answer that question, whether she did tell her or not. She is not going to be allowed to tell what she told her.

"Mr. Cocke: I reserve a bill of exceptions and make the question and answer of this witness and the Court's ruling part of the bill and also my request to the Court that he instruct the jury to disregard the question entirely.

"The Court: Well, naturally I can't tell the jury that after I once rule that it is admissible.

"Mr. Meyer: You can answer Yes or No.

"A. What was the question?

"Q. Did Mrs. Goodwin inform you or tell you how she received that black eye and injury to her side, when she came up to your place? Answer that Yes or No.

"A. She said Ernest did—

"Mr. Cocke: Of course, it was done very well. You can readily see, if your Honor please, how quickly the witness answered it after she had been repeatedly warned by the District Attorney and yourself and myself not to answer it. It was not done in fairness but intentionally. I would ask the court to instruct the jury to disregard that last answer.

"The Court: Gentlemen of the jury, the witness gratuitously enlarged upon the answer. The answer is absolutely hearsay and totally irrelevant and I instruct you gentlemen to pay no attention to her answer.

"Mr. Meyer: That's all."

Counsel contends that the trial judge committed reversible error in permitting hearsay evidence to be admitted over his objection, contrary to articles 434 and 463 of the Code of Criminal Procedure. He contends that the witness was permitted to give palpably hearsay, irrelevant, and immaterial testimony and that the district attorney and the trial judge could easily have foreseen what the witness' answer would be from the way the questioning was being conducted.

It is our opinion that the above-quoted portion of the record clearly shows that the district attorney and the trial judge did everything they possibly could to limit the witness' answer to a statement of fact peculiarly within her knowledge. They took every precaution possible by admonishing

the witness repeatedly to answer the question "yes" or "no" and not to state what she had been told. When she failed to obey their instructions and volunteered hearsay testimony, the jury was promptly instructed to disregard her gratuitous statement and to pay no attention to her answer.

In the case of State v. Rugero, 117 La. 1040, 42 So. 495, 496, a similar situation arose and we held that "a trial [cannot] be defeated by the act of a witness in volunteering an objectionable remark." See, also, State v. Wall, 167 La. 413, 119 So. 410.

◼ In a prosecution for murder, where the defense is accidental homicide, testimony tending to show that the deceased had previously received a severe beating, leaving bruises on her face and body, and that the deceased had told the witness how she had received those injuries, was relevant and material. Testimony showing the deceased's physical condition and that the deceased told the witness how she received the bruises is not hearsay but original evidence. State v. White, 178 La. 98, 150 So. 843.

◼ Bill of exception No. 4 was reserved to the court's ruling when the defendant was forced to answer the hereinafter questions under cross-examination by the State:

"Mr. Meyer: Q. Goodwin, you were charged in the Juvenile Court with nonsupport of this present wife that you are on trial for killing?

"A. Yes, Sir.

"Q. You were charged in a rule in the Civil District Court for contempt for non-payment of alimony for your first wife, were you not?

"Mr. Cocke: Now, we object to that.

"Mr. Meyer: ·That's a charge—

"(At this point the jury retired from the courtroom.) * * *

 "Argument by Both Counsel.

"The Court: I am going to let this question go in, but I am going to confine him strictly to the rules of law, as I understand them. Bring in the jury.

"(The jury returned into the courtroom.)

"Mr. Cocke: Will your Honor give your ruling, so that I may reserve my bill?

"The Court: The Court rules that the question is admissible.

"Mr. Cocke: To which ruling, counsel for the defendant objects and reserves this bill of exceptions, and, with all due deference and respect to the Court, contends that the question is objectionable for the reason that it is not a testing of the credibility of the witness, nor is it an arrest or a charge of crime such as is denounced in Article 495 of the Code of Criminal Procedure; that it is not a charge of crime for which the State has fixed a penalty, nor is it such a charge of crime upon which an arrest immediately in the name of the State is had, but that it is nothing more nor less than a rule filed by a private individual and served upon a defendant\ for the alleged contempt of a specific order of court.

"(Question read by the reporter as follows:)

"Q. You were charged in a rule in the Civil District Court for nonpayment ·of alimony for your first wife, were you not?

"A. I think I was, yes." (Tr. 177 and 178.)

Article 486 of the Criminal Code of Procedure, chapter 10, "Of Impeaching and Corroborative Evidence," provides:

"Each side has the right to impeach the testimony and the credibility of every witness sworn on behalf of the other side."

Article 490 of the same chapter provides:

"The credibility of a witness may be attacked generally, by showing that his general reputation for truth or for moral character is bad, or it may be attacked only insofar as his credibility in the case on trial is concerned."

Article 491 provides:

"When the general credibility is attacked, the inquiry must be limited to general reputation, and can not go into particular acts, vices or courses of conduct."

Article 495 reads:

"Evidence of conviction of crime, but not of arrest, indictment or prosecution, is admissible for the purpose of impeaching the credibility of the witness. But before evidence of such former conviction can be adduced from any other source than the witness whose credibility is to be impeached, he must have been questioned on cross-examination as to such conviction, and have failed distinctly to admit the same; *provided, always, that a witness, whether he be the defendant or not, may be compelled to answer on cross-examination whether or not he has ever been indicted or arrested and how many times.*" (Italics ours.)

In his per curiam, the trial judge states:

"The Court permitted the question to be asked and ruled that the witness should answer because the question was propounded in order to impeach his credibility, he having been sworn as a witness in his own behalf. Under Article 495 of the Code of Criminal Procedure such question is permitted in order to test the credibility of a witness, whether he be the defendant or not. Inasmuch as failure or refusal to pay alimony when ordered to do so by a judgment of Court may be punished by imprisonment in the Parish Prison, it is respectfully submitted to Your Honors that this Court considered the filing of such a Rule against the witness (Appellant), if such Rule in truth had been filed, partook of the nature of a criminal proceeding. If found guilty of contempt for failure to pay alimony, he could be confined in the Parish Prison for a certain period of time just as he might be there confined for the commission of a criminal offense. ·

"The witness being on cross-examination, and his credibility being an issue in the case, this Court did not consider the question propounded as being in ·the nature of unreasonable and oppressive cross-examination, or prejudicial or damaging to his defense. When counsel tendered him as a witness in his own behalf, thereby, in effect, vouching for his credibility, and asking the court and jury to accept his testi-

mony as that of a person to be believed, naturally, his credibility was subject to impeachment like that of any other witness in order to inquire of him concerning his past record. For that reason, as well as those above stated, the court permitted the question to be asked. (State v. Waldron, 128 La. 559 [54 So. 1009, 34 L.R.A.,N.S., 809]; State v. Quinn, 131 La. 490 [59 So. 913].)"

The witness had stated that he accidentally shot his wife, who tried to prevent him from committing suicide. He assigned as his reason for wanting to take his own life that he loved his wife so much he could not face life without her and was willing to destroy himself. The testimony sought to be elicited would certainly affect his credibility, if it could be shown that it was only through contempt proceedings he was compelled to support his wife. We agree with the learned trial judge that a rule for contempt of court in a civil proceeding is a quasi criminal matter. In a criminal case, the accused is fined or imprisoned because he violates the law. In a contempt proceeding the defendant is fined or imprisoned for having violated the order of the court which represents the law.

It is our opinion that defendant's contention is too technical and that the trial judge properly permitted the witness to answer.

▪ Bill of exception No. 5 was reserved to the court permitting alleged vituperative argument to the jury. The bill shows that, while the assistant district attorney was "arguing his appreciation of the evidence and drawing his conclusions

therefrom, he stated that Goodwin was a man who was actuated by primitive instincts and not by reason. * * *"

"Mr. Cocke: I object to the statement made by the Assistant District Attorney that this defendant is a creature of the jungle, that he is a man of primitive instincts, and that it would not be safe to permit this man to go on the streets of the City of New Orleans. It is admitted that the statement was made?"

"Mr. Mitchell: Yes.

"Mr. Cocke: We are trying this man for a crime he is alleged to have committed about a year ago. I say that that character of argument has never been permitted by any court or by the Supreme Court, and I ask your Honor to instruct the jury to disregard it and to warn the District Attorney to desist in it.

"Mr. Mitchell: Your Honor, I am drawing an implication from the evidence which I have a right to do in my argument. I have a right to comment.

"Now, I say to you that an animal that wants to do something and is prevented from doing it, becomes enraged; that a lion or a tiger or a hyena in the jungle that wants its particular piece of meat; or that wants to do a particular thing and is restricted from doing it and goes ahead and does it despite everything, I say to you that a human being who, being denied the object and the gratification of his wishes and resorts to violence, imitates, emulates and does everything that a jungle beast does, and I have a right to that inference.

"The Court: Gentlemen of the jury, you have heard the evidence. Whatever counsel tells you is his idea, and whatever counsel for the defense tells you is his idea. You are going to have to decide for yourselves what the evidence shows. Whether Mr. Mitchell is going too far or not in his argument, in his comparison of this man, is something for you all to decide. You heard the entire trial. You are going to find this man either guilty or innocent on what you have heard in the evidence.

"Mr. Cocke: Then, I take it your Honor overrules my motion to instruct the jury to disregard that language?

"The Court: That is my ruling.

"Mr. Cocke: To which ruling of the Court, counsel for the defense reserves a bill of exceptions. * * *"

Counsel for the defendant argues that the assistant district attorney's remarks exceed the bounds of legitimate argument and descend to nothing more or less than personal abuse; that the statements were calculated and intended to inflame and prejudice the jury, which it did in an illegal and unlawful manner; and that the trial judge's failure to instruct the jury to disregard the same and to instruct counsel to desist from any further vituperative and personal abuse of the defendant constituted reversible error, citing article 381 of the Code of Criminal Procedure.

The trial judge in his per curiam states that there was evidence in the record from which the assistant district attorney could logically and fairly argue that the conduct of the accused showed he was acting by

primitive instincts as a creature of the jungle does and not by reason. He points to the testimony of Mr. and Mrs. Henry E. Bazajou that the deceased screamed, "Don't," and, after being shot, ran through the house screaming, "help me, help me," and, after being apprehended in the rear yard by the accused, although in a serious condition, was asked by him, "Why didn't you meet me?" He also points to the testimony of the fellow police officers who testified that defendant voluntarily said, "She disappointed me and I just killed her," and particularly to the testimony of Capt. Keupferle, who testified that, when he spoke to Goodwin, he asked him, "What's the matter with you, Ernest, are you going crazy?" and that Ernest replied, "No, I just could not take it. She disappointed me and I just killed her." Reference is also made to a dramatic incident which transpired during the trial when the accused said to Mrs. Bazajou while she was on the stand, "Rose, do you know what you are doing to me? Be truthful, Rose." This emotional outbreak resulted in his counsel asking the court for a recess until his client could compose himself.

The trial judge in his per curiam says:

"In view of the above excerpts from the record, this Court is of the opinion that the remarks of the Assistant District Attorney, objected to by counsel for the defendant, were not vituperative and did not exceed the bounds of legitimate argument. They were conclusions and deductions drawn by the District Attorney from the testimony of witnesses who were heard by the Jury, and were justified by the evidence.

"This Court did not consider the argument of the District Attorney as an appeal to prejudice, and he did not go outside of the record to bring to the attention of the jury any facts connected with the case which had not been given in evidence.

"The District Attorney has a right to argue his case with all of the eloquence at his command, and this right is quite as extensive as that of counsel for the accused. (State v. Genna, 163 La. 701 [112 So. 655]; State v. Graziani, 168 La. [297] 298 [121 So. 872]; State v. Dallao et al., [187 La. 392] 175 So. 4.)"

Our views are in accord with those of the trial judge. State v. Morgan, 145 La. 585, 82 So. 711; State v. Holbrook, 153 La. 1025, 97 So. 27.

State v. Dwyer, 133 La. 731, 63 So. 305, is not apposite here, because there the court found that the arguments and the conclusions of counsel for the State were not borne out or warranted by the evidence.

■ Bills of exceptions Nos. 6, 7, 9, and 12 were reserved to the trial judge's refusal to give several special charges to the jury with reference to the law of accidental homicide. They are treated jointly in the defense counsel's brief and we shall likewise consider them.

Bill of exception No. 9 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 8, reading as follows:

"It is not every killing that is criminal. Under the law a killing might be either excusable or justifiable

"A homicide in self-defense is a justifiable homicide. .

"An accidental homicide is a killing in which the intent to take life or to do great bodily harm is absent and lacking. It is a killing wherein through a misadventure a person kills another, without intention, in the doing of a lawful act unaccompanied by any criminal carelessness or recklessness on his part. If a killing should happen under these conditions, it would be an accidental homicide, for which the defendant is not held accountable and for which he should be acquitted." (Tr. 282.)

Bill of exception No. 6 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 14, which reads as follows:

"The Court instructs the jury, that if they find from the evidence, that defendant was in the act of taking his own life, and in so doing had a pistol pointed towards his own person, in no way endangering the life of the deceased, or of causing her great bodily harm, when suddenly the deceased seized or struck said weapon in an intentional effort and by force to prevent the defendant from taking his own life, causing said weapon to explode, accidentally killing deceased, through no negligence or fault upon the part of accused, the jury should find the defendant not guilty." (Tr. 276.)

Bill of exception No. 7 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 1, reading as follows:

"The Court instructs the jury, that if they find from the evidence that the defendant

was in the attempted taking of his own life, having in his hand at the time a pistol pointed at his own person, and that the deceased seized hold of the pistol in the hand of the defendant and attempted to take the pistol from defendant by force and in the scuffle which ensued the pistol was accidentally discharged and produced the death of the deceased by accident and without the fault or culpable negligence of the defendant, the jury should find the defendant not guilty." (Tr. 278.)

Bill of exception No. 12 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 13 reading as follows:

"The Court instructs the jury, that should they find from the evidence, that the defendant did shoot and thereby kill the deceased, and should they further find from the evidence, that such shooting was accidental and not intentional and that at the time of the killing defendant was not engaged in the doing of an unlawful act, nor was he guilty of gross carelessness, recklessness, or negligence, such as would place the average prudent man upon notice that the result of his gross negligence, carelessness and recklessness might probably endanger the life of the deceased, or cause her great bodily harm, the killing would then be excusable, and you should find the defendant not guilty." (Tr. 288.)

The district judge refused to give these special charges on the ground that he had substantially covered them in his general charge to the jury.

Counsel for the defense argues that the trial court committed reversible error, because the special charges he requested were wholly correct as propositions of law; that they were pertinent to the facts in issue; and that the matters contained therein had not already been given by the court to the jury in its general charge. He further complains that there is a confusion in the general charge with reference to the accidental homicide and involuntary manslaughter.

The trial judge, after instructing the jury on the law with reference to murder, said:

"Manslaughter is the felonious killing of a human being without malice, either expressed or implied.

"It differs from murder in the element of malice, which must exist in murder, and which does not exist in manslaughter. Intentional killing is manslaughter if it is committed under the influence of passion induced by serious and sufficient provocation. It is not every provocation that will reduce a killing from murder to manslaughter; it must be an adequate provocation, that is to say, a provocation sufficient to excite an irresistible passion. If the provocation does not produce this result, the killing would be murder. The provocation must be such as will give rise to irresistible passion in a reasonable man.

"The killing must be the result of the provocation, and the act resulting in death must have been committed at the time of the provocation, for otherwise, that is to say, if done after a lapse of time sufficient

to allow of the cooling of the passion, the killing would be murder. The provocation must be such as to deprive one of the power of self-control. This is to be determined by the circumstances of each case, regard being had, in considering the question, to the act by which death was caused, the time which elapsed between the provocation and the act, the conduct of the accused during that time and any and all other circumstances which may aid in reaching a conclusion.

"Provocation is not available as a defense if it was invited by the accused with the intention of resenting it.

"To entitle the State to a verdict of guilty of manslaughter it must appear, beyond a reasonable doubt, from the evidence, that the injury complained of was occasioned by want of attention, carelessness or gross negligence on the part of the defendant, and that the injury was not simply the result of an accident, and, if you believe, from the evidence, that the injury resulted from an accident, which could not have been foreseen or guarded against by the exercise of ordinary and reasonable care and prudence on the part of the defendant, then you will acquit the defendant.

"To render the defendant liable he must have been guilty of gross and culpable negligence by failure to exercise the proper care in the handling of a loaded revolver and not of mere mistake or error in judgment, and the death must have been the result of such negligence.

"Criminal negligence means gross negligence such as amounts to the careless disregard for one's own safety or for the safety of others and wilful indifference to the consequence likely to follow.

"If you believe, from the evidence, that the injury complained of was from the result of an inevitable accident, then you should find the defendant not guilty.

"You are instructed that the import and meaning of the words: 'inevitable accident' is this: Where one is pursuing a lawful avocation in a lawful manner and something occurs which no ordinary skill or precaution could foresee or prevent, and, as a consequence, the accident takes place, this is called 'inevitable accident.' * * *

"If you should find that the accused had exercised due care and that the death in this case was not due to any negligence on his part but was accidental, then you should find him not guilty.

"If, on the other hand, you find that through negligence or carelessness in the handling of a loaded revolver, or in not exercising that care required of him in the handling of a loaded revolver and death resulted, he would be guilty of manslaughter. Where one by his negligence or carelessness has caused or contributed to the death of another, he is guilty of manslaughter."

Defendant's attorney cites Wharton's definition of "accidental homicide" as a correct statement of the law, as follows:

"Homicide by misadventure is the accidental killing of another when the slayer is doing a lawful act unaccompanied by any criminal carelessness or reckless conduct. Misadventure, when applied to homicide, is

the act of a man, who in the performance of a lawful act, without intention to do harm, after using proper precautions to avoid danger, unfortunately kills a person. And if a killing was unintentional, and the perpetrator had no wrong purpose in doing the act causing death, and it was done accidentally when he was engaged in no unlawful act, and not negligently, then the act of killing is a homicide by misadventure."

In State v. Lee, 180 La. 494, 156 So. 801, 803 this court defined "involuntary manslaughter" as follows:

"Involuntary manslaughter is defined to be 'the unlawful killing of a human being in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.'"

The trial judge simply instructed the jurors that it was encumbent upon the State to prove to their satisfaction and beyond a reasonable doubt that the gross or culpable negligence of the defendant in handling his revolver caused his wife's death before they could find him guilty of manslaughter, and, if the jury concluded that he had exercised ordinary care and prudence in handling his revolver—but it exploded—and the deceased was shot and died as a result thereof, that her death was accidental and the accused should be acquitted. The reason for this is that, if the accused had exercised ordinary care and prudence in handling his revolver, he could not be guilty of culpable or gross negligence. Apparently, this was defendant counsel's appreciation of the judge's charge—for, in discussing the meaning of these instructions, on page 60 of his brief, he says:

"Again if due care was exercised, and death was not due to negligence but was accidental, accused should be found not guilty."

The trial judge, like the law writer, Wharton, in the opening part of his statement of the law defined "criminal negligence" and thereafter did not continuously repeat that term, but referred to it as "negligence." In short, the first part of the court's charge qualified the balance of it on this subject.

Homicide by misadventure or accidental killing is classified as involuntary homicide. The law with reference to involuntary manslaughter and homicide by misadventure are closely allied and no confusion results when the law on these two subjects is given to the jury at the same time. The trial judge's general charge covers ten typewritten legal sheets of paper, and to add to it the several special charges requested by the defendant, where the subject had already been reasonably and substantially covered, would merely be a duplication of instructions, which the accused was not entitled to. State v. Marsalise, 172 La. 796, 135 So. 361; State v. Nahoum, 172 La. 83, 133 So. 370; State v. Elliott, 171 La. 306, 131 So. 28, 77 A.L.R. 314; State v. Seal, 175 La. 103, 143 So. 18; State v. Jones, 174 La. 1074, 142 So. 693; State v. Ducre, 173 La. 438, 137 So. 745; State v. Bryan, 175 La. 422, 143 So. 362; State v. Jackson, 142 La. 540, 77 So. 196, L.R.A. 1918B, 1178, and State v. Foster, 106 La. 425, 31 So. 57.

▮ Bill of exception No. 8 was reserved to the court's action in refusing to give special charge No. 16 to the jury. It reads as follows:

"An act cannot be criminal or unlawful in a legal sense, unless it is denounced by law as an offense, and subjects the person who commits it to legal punishment.

"Under the law of Louisiana nothing is criminal or unlawful, unless the law denounces it as such, and fixes a punishment for its violation.

"There is no law in the State of Louisiana which denounces as criminal or unlawful the attempt by one to take his own life, nor does any law fix a penalty or punishment for such an attempt.

"I, therefore charge you, gentlemen of the jury, that an attempt by one to take his own life, is not an unlawful act, under the law of Louisiana."

The trial judge, in his per curiam, states that he refused to give the special charge because he had substantially covered it in his general instructions. He states that a judge should not be required to select particular circumstances for the consideration of the jury and thereby give undue prominence and importance to them, referring to State v. Mehojovich, 118 La. 1013, 43 So. 660; and that the charge must be taken as a whole in order to determine whether or not it is prejudicial, citing State v. Blount, 124 La. 202, 50 So. 12.

Our learned brother below was justified in refusing to grant this special charge, because even accepting the accused's testimony and conceding arguendo that there is no law making it a criminal offense to attempt to take one's life, the manner in which the accused admits he proceeded to do so was entirely unlawful. According to his own statement he went into the home of a friend, in the middle of the night, and, after being received in a friendly way, summoned his wife, pulled his revolver in the presence of his wife, and then attempted to destroy himself. He was guilty of an unlawful act in creating a disturbance of the peace by his conduct and by discharging a firearm in his friend's home at midnight. The statement of defendant's counsel that this special charge was wholly pertinent to the issues and the facts of the case is therefore unwarranted.

The requested charge completely ignores the fact that the alleged lawful attempt at suicide was being carried out in an unlawful manner. The requested special charge, therefore, required clarification, limitation, and explanation. We conclude that the ruling of the trial court was correct.

▮ Counsel for defendant treats bills of exception Nos. 10, 11, 13, and 15 jointly, because they relate to the same subject matter, to wit, the refusal of the court to grant these four requested special charges on the question of the burden of proof where the killing is admitted but excused for reasons good in law.

Bill of exception No. 10 was reserved to the court's action in refusing to instruct

the jury as contained in special charge No. 5, reading as follows:

"The defense of killing by accident or misfortune does not remove the State's burden of proving an intentional killing beyond all reasonable doubt."

Bill of exception No. 11 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 4, reading as follows:

"I charge you that the State has the burden of proving beyond a reasonable doubt that the killing was unlawful and not excusable or justifiable, as an accident, and that the defendant is entitled to the benefit of a reasonable doubt upon the question of whether the homicide was excusable, as an accident. If, after weighing all the evidence in this case, you have a reasonable doubt as to whether or not it was an accident, the defendant is entitled to an acquittal."

Bill of exception No. 13 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 9, reading as follows:

"Under the law, as has been told you, the burden of proof is upon the State to establish guilt beyond a reasonable doubt. In consequence of this rule of law, should a defendant plead accidental homicide in defense of a charge of murder, he does not have to prove either by a preponderance of the evidence, nor beyond a reasonable doubt, that the killing was accidental. The burden of proof being upon the State, the duty is upon the State to

prove to your entire satisfaction and beyond a reasonable doubt that the killing was not accidental but was intentional, and was therefore murder or manslaughter in keeping with the court's definition of these two crimes. If the State should fail to prove to your entire satisfaction and beyond a reasonable doubt that the homicide was not an accidental killing, but was intentional, and was therefore murder or manslaughter in keeping with the court's definition of these two crimes. If the State should fail to prove to your entire satisfaction and beyond a reasonable doubt that the homicide was not an accidental killing, or should you entertain a reasonable doubt whether the State has failed to so prove, it would be your duty to acquit the defendant."

Bill of exception No. 15 was reserved to the court's action in refusing to instruct the jury as contained in special charge No. 12, reading as follows:

"In the case on trial, in order to justify a conviction of murder or any other crime included therein, the circumstances offered in evidence, must not only prove beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis, that the defendant, killed the deceased, but in addition thereto, they must satisfy you by the same measure of proof, that the killing was unlawful, malicious and unjustifiable, and was therefore murder or manslaughter. They must also satisfy you beyond a reasonable doubt and to the exclusion of every reasonable hypothesis, that the killing was not the result of an accident. The burden

of proof being upon the State to prove its case, the accused is not called upon to prove the killing was the result of an accident. If the circumstances offered in evidence leave it doubtful whether the killing, if proved, was the result of an accident, or whether the killing was intentional and was therefore murder or manslaughter, it would be your duty to acquit the defendant."

Counsel for defendant contends that reversible error was committed because accidental killing, like a plea of self-defense, is not a special plea and the burden of proof rests upon the State to show beyond a reasonable doubt that the killing was not justifiable or accidental, citing article 439, Code of Criminal Procedure; State v. Ardoin, 128 La. 14, 54 So. 407, Ann.Cas. 1912C, 45; State v. Varnado, 128 La. 883, 55 So. 562; State v. Herring et al., 131 La. 972, 60 So. 634; State v. Sandiford, 149 La. 933, 90 So. 261.

The trial judge, in his per curiam to these bills, states that he covered the subject matter in his general charge. The pertinent part of the court's general charge reads as follows:

"Gentlemen, the defendant at the bar is presumed to be innocent until he is proven guilty beyond a reasonable doubt.

"The consequence of this rule of law is, he is not required to prove his innocence, but may rest upon the presumption in his favor until it is overthrown by positive, affirmative proof. The onus is, therefore, upon the State to establish to your satisfaction, and beyond reasonable

doubt, the guilt of the defendant, as to the crime charged in the indictment, or any lesser one included in it.

"If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal. And, even where the evidence demonstrates a probability of guilt, yet, if it does not establish it beyond a reasonable doubt, you must acquit the defendant. This doubt must be a reasonable one, that is, one founded upon a real tangible, substantial basis, and not upon a mere caprice, fancy or conjecture. It must be such a doubt as would give rise to a grave uncertainty raised in your minds by reason of the unsatisfactory character of the evidence; one that would make you feel that you had not an abiding conviction to a moral certainty as to the defendant's guilt. To put it differently, you must be satisfied of the defendant's guilt by that degree of assurance which induces a man of sound mind to act without doubt upon the conclusions to which it leads. If, after giving a fair and impartial consideration to all the facts in the case, you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty." (Tr. 228.)

It is our opinion that the court's instructions substantially include the requested charges and, therefore, these bills are without merit.

The case of State v. Bridges, 149 La. 844, 90 So. 217, is not in point, because there the judge instructed the jury that the defendant bore the burden of proving by a preponderance of the evidence that the alleged accidental homicide was excusable.

 Bill of exception No. 12 was reserved by the defendant to the trial court's action in refusing to give special charge No. 13, which reads as follows:

"The court instructs the jury, that should they find from the evidence, that the defendant did shoot and thereby kill the deceased, and should they further find from the evidence, that such shooting was accidental and not intentional and that at the time of the killing defendant was not engaged in the doing of an unlawful act, nor was he guilty of gross carelessness, recklessness, or negligence such as would place the average prudent man upon notice that the result of his gross negligence, carelessness and recklessness might probably endanger the life of the deceased, or cause her great bodily harm, the killing would then be excusable, and you should find the defendant not guilty."

We concur in the statement of the trial judge, in his per curiam, that the general charge adequately covered this special instruction. In passing, we might make the observation that this requested special charge by the defendant clearly demonstrates how closely allied and connected the law is with reference to accidental killing or homicide and involuntary manslaughter.

 Bill of exception No. 14 was reserved to the court's action in refusing to instruct the jury as contained in charge 15, reading as follows:

"I further charge you that if in the consideration of the possible verdicts you might render in this case, you should have a reasonable doubt as to which one of two verdicts you might return, you should resolve this doubt in favor of the accused, and should return that verdict most favorable to him."

The district judge in his per curiam states that, in his opinion, the general charge substantially covered the requested special charge.

Defendant's attorney disagrees with the district judge and cites article 387 of the Code of Criminal Procedure, which reads as follows:

"And whenever it is proper to charge to jury as to the several grades of the offense set out in the indictment, the judge shall charge the jury that, if they have a reasonable doubt as to the grade of the offense committed by the defendant it is their duty to find him guilty only of that grade of which they are convinced beyond a reasonable doubt he is guilty."

This is a case where it was proper to charge the jury on the several grades of offense set out in the indictment. Under the law, it was the duty of the trial judge to so instruct the jury. If it be said that the general charge did not substantially cover the requested special charge, no injury, prejudice, or harm was done to the defendant, because the jury found him

guilty of the lesser offense and, therefore, if they had entertained any doubt as to whether he was guilty of murder or manslaughter, he obtained everything he could possibly hope to gain under the requested special charge.

Bill of exception No. 16 was reserved to that part of the general charge of the court dealing with the law of involuntary manslaughter. We have already referred to it at length in considering bills of exception Nos. 6, 7, 9, and 12, ante. The complaint is that the theory of the State's case was that the defendant had gone to the home of his wife with the intention of committing murder and accomplished his purpose; the defense was that it was accidental homicide, and therefore the law of involuntary manslaughter was not pertinent to the issues and facts of the case, and defendant's rights were prejudiced by the court's instructions to the jury on this subject.

■ The State's evidence tended to show that plaintiff was either guilty of murder or manslaughter. The defendant's evidence was offered for the purpose of showing that the killing was accidental. However, under the law, the jury did not have to accept the defendant's evidence in toto as being truthful and could reject all of it or any part of it. If the jurors concluded that the defendant went to the deceased's home for the purpose of effecting a reconciliation with his wife and attempted to commit suicide when she declined to return home with him, and also believed that his attempt at self-destruction was being effected in an unlawful manner or that he handled the revolver with gross negligence and recklessness, which resulted in his wife's death, it then becomes apparent that the court was obliged to instruct the jury with reference to the law of involuntary manslaughter. If the court had not done so, its general instructions would not have fully covered the field of possible verdicts. The law is clear that under a charge of murder the court must also instruct the jury with reference to the law of manslaughter and this, of course, includes voluntary and involuntary manslaughter. State v. Tucker, 38 La.Ann. 536.

■ Bill of exception No. 17 was reserved to the trial judge's action in overruling the motion for a new trial. The matters urged in this motion have been fully argued under all of the foregoing bills of exception and will not be repeated. The trial judge in his per curiam states:

"There being nothing new in said motion for a new trial, and the court believing that the appellant had been given a fair and impartial trial, overruled the motion."

It is well-settled that a bill of exception reserved to overruling a motion for a new trial based on the ground that the verdict of the trial court is contrary to the law and the evidence does not present any question of law for review. State v. Proctor et al., 165 La. 584, 115 So. 759; State v. McKee, 170 La. 630, 631, 128 So. 658.

For the reasons assigned, the verdict and sentence of the district court are affirmed.

FOURNET, J., concurs.

O'NIELL, C. J., concurs in the result and assigns reasons.

O'NIELL, Chief Justice (concurring).

I concur in the decree, affirming the verdict and sentence in this case, because I am convinced that no injustice resulted from any error in the rulings of the judge, if in fact any such error was committed. I do not, however, concur in all that is said in the prevailing opinion. My opinion is that such testimony as that which is referred to in bill of exception No. 3 is hearsay evidence, and is not admissible; but any harm that might have resulted from the hearing of the testimony in this case was avoided by the prompt admonition of the judge to the jury, at the request of the attorney for the defendant, that the testimony was "absolutely hearsay and totally irrelevant," and should be disregarded by the jury. Referring to bill of exception No. 5, my opinion is that the judge should have disapproved the character of argument made by the assistant district attorney, and should have complied with the request of the defendant's attorney, to admonish the jury to disregard the argument. But I do not believe that the verdict of the jury was influenced by the argument complained of. I subscribe to the ruling on bill of exception No. 4 on the ground only that the special charge which the judge was requested to give, and which he refused to give, was covered by his general charge to the jury.