# WITHERSPOON *v.* ILLINOIS ET AL.

No. 1015.   Argued April 24, 1968.—Decided June 3, 1968.

*Albert E. Jenner, Jr.,* argued the cause for petitioner. With him on the briefs were *Thomas P. Sullivan, Jerold S. Solovy,* and *John C. Tucker.*

*Donald J. Veverka,* Assistant Attorney General, argued the cause for respondent State of Illinois. With him on the brief were *William G. Clark,* Attorney General, and *John J. O'Toole,* Assistant Attorney General. *James B. Zagel* argued the cause for respondent Woods, *pro hac vice.* With him on the brief were *John J. Stamos, Elmer C. Kissane,* and *Joel Flaum.*

*Robert R. Granucci,* Deputy Attorney General, argued the cause for the State of California, as *amicus curiae.* With him on the brief were *Thomas C. Lynch,* Attorney General, *Albert W. Harris, Jr.,* Assistant Attorney General, and *George R. Nock,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *MacDonald Gallion* of Alabama, *Darrell F. Smith* of Arizona, *Joe Purcell* of Arkansas, *Duke W. Dunbar* of Colorado, *David P. Buckson* of Delaware, *Earl Faircloth* of Florida, *Arthur K. Bolton* of Georgia, *Allan G. Shepard* of Idaho, *Robert C. Londerholm* of Kansas, *John B. Breckinridge* of Kentucky, *Jack P. F. Gremillion* of Louisiana, *Norman H. Anderson* of Missouri, *Clarence A. H. Meyer* of Nebraska, *George S. Pappagianis* of New Hampshire, *Boston E. Witt* of New Mexico, *Helgi Johanneson* of North Dakota, *William B. Saxbe* of Ohio, *G. T. Blankenship* of Oklahoma, *William C. Sennett* of Pennsylvania, *Daniel R. McLeod* of South Carolina, *Frank L. Farrar* of South Dakota, *George F. McCanless* of Tennessee, *Crawford C. Martin* of Texas,

512

*Robert Y. Button* of Virginia, *John J. O'Connell* of Washington, and *James E. Barrett* of Wyoming; and by *Marion O. Gordon,* Assistant Attorney General of Georgia, *Frank P. Lawley,* Deputy Attorney General of Pennsylvania, *Reno S. Harp III,* Assistant Attorney General of Virginia, and *Howard L. McFadden.*

Briefs of *amici curiae* were filed by *Elmer Gertz* for the Illinois Division, American Civil Liberties Union; by *Jack Greenberg, James M. Nabrit III, Michael Meltsner, Leroy D. Clark, Norman C. Amaker,* and *Charles S. Ralston* for the NAACP Legal Defense and Educational Fund, Inc., et al.; by *Alex Elson, Willard J. Lassers,* and *Marvin Braiterman* for the American Friends Service Committee et al.; by *F. Lee Bailey, pro se;* by *Joel W. Westbrook* for Turner, and by *John P. Frank* and *John J. Flynn* for Madden.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was brought to trial in 1960 in Cook County, Illinois, upon a charge of murder. The jury found him guilty and fixed his penalty at death. At the time of his trial an Illinois statute provided:

> "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." [1]

Through this provision the State of Illinois armed the prosecution with unlimited challenges for cause in order

[1] Ill. Rev. Stat., c. 38, § 743 (1959). The section was re-enacted in 1961 but was not expressly repeated in the Code of Criminal Procedure of 1963. Ill. Rev. Stat., c. 38, § 115–4 (d) (1967) now provides only that "[e]ach party may challenge jurors for cause," but the Illinois Supreme Court has held that § 115–4 (d) incorporates former § 743. *People* v. *Hobbs,* 35 Ill. 2d 263, 274, 220 N. E. 2d 469, 475.

to exclude those jurors who, in the words of the State's highest court, "might hesitate to return a verdict inflicting [death]." [2] At the petitioner's trial, the prosecution eliminated nearly half the venire of prospective jurors by challenging, under the authority of this statute, any venireman who expressed qualms about capital punishment. From those who remained were chosen the jurors who ultimately found the petitioner guilty and sentenced him to death. The Supreme Court of Illinois denied post-conviction relief,[3] and we granted certiorari [4] to decide whether the Constitution permits a State to execute a man pursuant to the verdict of a jury so composed.

## I.

The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt.[5] Nor does it involve the State's assertion of a

[2] "In the trial of the case where capital punishment may be inflicted a juror who has religious or conscientious scruples against capital punishment *might hesitate to return a verdict inflicting such punishment,* and in the present proceedings [a post-sentence sanity hearing] a juror having such scruples might likewise hesitate in returning a verdict finding [the defendant] sane, which in effect confirms the death sentence." *People* v. *Carpenter,* 13 Ill. 2d 470, 476, 150 N. E. 2d 100, 103. (Emphasis added.)

[3] 36 Ill. 2d 471, 224 N. E. 2d 259.

[4] 389 U. S. 1035.

[5] Unlike the statutory provision in this case, statutes and rules disqualifying jurors with scruples against capital punishment are often couched in terms of reservations against finding a man *guilty* when the penalty might be death. See, *e. g.,* Cal. Penal Code, § 1074, subd. 8. Yet, despite such language, courts in other States have sometimes permitted the exclusion for cause of jurors opposed to the death penalty even in the absence of a showing that their scruples would have interfered with their ability to determine

right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it.

In the present case the tone was set when the trial judge said early in the *voir dire,* "Let's get these conscientious objectors out of the way, without wasting any time on them." In rapid succession, 47 veniremen were successfully challenged for cause on the basis of their attitudes toward the death penalty. Only five of the 47 explicitly stated that under no circumstances would they vote to impose capital punishment.[6] Six said that they did not "believe in the death penalty" and were excused without any attempt to determine whether they could nonetheless return a verdict of death.[7] Thirty-

---

guilt in accordance with the evidence and the law. See, *e. g., State* v. *Thomas,* 78 Ariz. 52, 58, 275 P. 2d 408, 412; *People* v. *Nicolaus,* 65 Cal. 2d 866, 882, 423 P. 2d 787, 798; *Piccott* v.. *State,* 116 So. 2d 626, 628 (Fla.); *Commonwealth* v. *Ladetto,* 349 Mass. 237, 246, 207 N. E. 2d 536, 542; *State* v. *Williams,* 50 Nev. 271, 278, 257 P. 619, 621; *Smith* v. *State,* 5 Okla. Cr. 282, 284, 114 P. 350, 351; *State* v. *Jensen,* 209 Ore. 239, 281, 296 P. 2d 618, 635; *State* v. *Leuch,* 198 Wash. 331, 333–337, 88 P. 2d 440, 441–442.

[6] The State stresses the fact that the judge who presided during the *voir dire* implied several times that only those jurors who could *never* agree to a verdict of death should deem themselves disqualified because of their scruples against capital punishment. The record shows, however, that the remarks relied upon by the State were not made within the hearing of every venireman ultimately excused for cause under the statute. On the contrary, three separate venires were called into the courtroom, and it appears that at least 30 of the 47 veniremen eliminated in this case were not even present when the statements in question were made.

[7] It is entirely possible, of course, that even a juror who believes that capital punishment should never be inflicted and who is irrev-

nine veniremen, including four of the six who indicated that they did not believe in capital punishment, acknowledged having "conscientious or religious scruples against the infliction of the death penalty" or against its infliction "in a proper case" and were excluded without any effort to find out whether their scruples would invariably compel them to vote against capital punishment.

Only one venireman who admitted to "a religious or conscientious scruple against the infliction of the death penalty in a proper case" was examined at any length. She was asked: "You don't believe in the death penalty?" She replied: "No. It's just I wouldn't want to be responsible." The judge admonished her not to forget her "duty as a citizen" and again asked her whether she had "a religious or conscientious scruple" against capital punishment. This time, she replied in the negative. Moments later, however, she repeated that she would not "like to be responsible for . . . deciding somebody should be put to death." [8] Evidently satisfied that this elaboration of the prospective juror's views disqualified her under the Illinois statute, the judge told her to "step aside." [9]

---

ocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the State. See *Commonwealth v. Webster*, 59 Mass. 295, 298. See also *Atkins v. State*, 16 Ark. 568, 580; *Williams v. State*, 32 Miss. 389, 395–396; *Rhea v. State*, 63 Neb. 461, 472–473, 88 N. W. 789, 792.

[8] Compare *Smith v. State*, 55 Miss. 410, 413–414: "The declaration of the rejected jurors, in this case, amounted only to a statement that they would not like . . . a man to be hung. Few men would. Every right-thinking man would regard it as a painful duty to pronounce a verdict of death upon his fellow-man. . . . For the error in improperly rejecting [these] two members of the special *venire* the case must be reversed."

[9] As the *voir dire* examination of this venireman illustrates, it cannot be assumed that a juror who describes himself as having "conscientious or religious scruples" against the infliction of the

516

II.

The petitioner contends that a State cannot confer upon a jury selected in this manner the power to determine guilt. He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's ver-

---

death penalty or against its infliction "in a proper case" (see *People* v. *Bandhauer*, 66 Cal. 2d 524, 531, 426 P. 2d 900, 905) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him. See also the *voir dire* in *Rhea* v. *State*, 63 Neb. 461, 466–468, 88 N. W. 789, 790. Cf. *State* v. *Williams*, 50 Nev. 271, 278, 257 P. 619, 621. Obviously many jurors "could, notwithstanding their conscientious scruples [against capital punishment], return . . . [a] verdict [of death] and . . . make their scruples subservient to their duty as jurors." *Stratton* v. *People*, 5 Colo. 276, 277. Cf. *Commonwealth* v. *Henderson*, 242 Pa. 372, 377, 89 A. 567, 569. Yet such jurors have frequently been deemed unfit to serve in a capital case. See, *e. g.*, *Rhea* v. *State, supra*, 63 Neb., at 470–471, 88 N. W., at 791–792. See generally Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Tex. L. Rev. 545, 547–548 (1961); Comment, 1968 Duke L. J. 283, 295–299.

The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors. Any "layman . . . [might] say he has scruples if he is somewhat unhappy about death sentences. . . . [Thus] a general question as to the presence of . . . reservations [or scruples] is far from the inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases." *Id.*, at 308–309. Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.

sion of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he describes as "competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence." [10]

The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. [11] We simply cannot

---

[10] In his brief, the petitioner cites two surveys, one involving 187 college students, W. C. Wilson, Belief in Capital Punishment and Jury Performance (Unpublished Manuscript, University of Texas, 1964), and the other involving 200 college students, F. J. Goldberg, Attitude Toward Capital Punishment and Behavior as a Juror in Simulated Capital Cases (Unpublished Manuscript, Morehouse College, undated). In his petition for certiorari, he cited a study based upon interviews with 1,248 jurors in New York and Chicago. A preliminary, unpublished summary of the results of that study stated that "a jury consisting only of jurors who have no scruples against the death penalty is likely to be more prosecution prone than a jury on which objectors to the death penalty sit," and that "the defendant's chances of acquittal are somewhat reduced if the objectors are excluded from the jury." H. Zeisel, Some Insights Into the Operation of Criminal Juries 42 (Confidential First Draft, University of Chicago, November 1957).

[11] During the post-conviction proceedings here under review, the petitioner's counsel argued that the prosecution-prone character of "death-qualified" juries presented "purely a legal question," the resolution of which required "no additional proof" beyond "the facts . . . disclosed by the transcript of the voir dire examination . . . ." Counsel sought an "opportunity to submit evidence" in support of several contentions unrelated to the issue involved here. On this issue, however, no similar request was made, and the studies relied upon by the petitioner in this Court were not mentioned. We can only speculate, therefore, as to the precise meaning of the terms used in those studies, the accuracy of the techniques employed, and the validity of the generalizations made. Under these circumstances, it is not surprising that the *amicus curiae* brief filed by the NAACP Legal Defense and Educational Fund finds it necessary to observe that, with respect to bias in favor of the

conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

## III.

It does not follow, however, that the petitioner is entitled to no relief. For in this case the jury was entrusted with two distinct responsibilities: first, to determine whether the petitioner was innocent or guilty; and second, if guilty, to determine whether his sentence should be imprisonment or death.[12] It has not been shown that this jury was biased with respect to the petitioner's guilt. But it is self-evident that, in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that impartiality to which the petitioner was entitled under the Sixth and Fourteenth Amendments. See *Glasser* v. *United States,* 315 U. S. 60, 84–86; *Irvin* v. *Dowd,* 366 U. S. 717, 722–723; *Turner* v. *Louisiana,* 379 U. S. 466, 471–473.

The only justification the State has offered for the jury-selection technique it employed here is that individuals who express serious reservations about capital punishment cannot be relied upon to vote for it even

prosecution on the issue of guilt, the record in this case is "almost totally lacking in the sort of factual information that would assist the Court."

[12] At the time of the petitioner's trial, the jury's penalty determination was binding upon the judge. Ill. Rev. Stat., c. 38, §§ 360, 801 (1959). That is no longer the case in Illinois, for the trial judge is now empowered to reject a jury recommendation of death, Ill. Rev. Stat., c. 38, § 1–7 (c)(1) (1967), but nothing in our decision turns upon whether the judge is bound to follow such a recommendation.

when the laws of the State and the instructions of the trial judge would make death the proper penalty. But in Illinois, as in other States,[13] the jury is given broad discretion to decide whether or not death *is* "the proper penalty" in a given case, and a juror's general views about capital punishment play an inevitable role in any such decision.

A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror. But a jury from which all such men have been excluded cannot perform the task demanded of it. Guided by neither rule nor standard, "free to select or reject as it [sees] fit,"[14] a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death.[15] Yet, in a

---

[13] See generally H. Kalven & H. Zeisel, The American Jury 435, 444, 448–449 (1966).

[14] *People* v. *Bernette,* 30 Ill. 2d 359, 370, 197 N. E. 2d 436, 443.

[15] It is suggested in a dissenting opinion today that the State of Illinois might "impose a particular penalty, including death, on all persons convicted of certain crimes." *Post,* at 541. But Illinois has attempted no such thing. Nor has it defined a category of capital cases in which "death [is] the *preferred* penalty." *People* v. *Bernette, supra,* at 369, 197 N. E. 2d, at 442. (Emphasis added.) Instead, it has deliberately "made . . . the death penalty . . . an optional form of punishment which [the jury remains] free to select or reject as it [sees] fit." 30 Ill. 2d, at 370, 197 N. E. 2d, at 443. And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles,* 356 U. S. 86, 101 (opinion of THE CHIEF JUSTICE, joined by MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and Mr. Justice Whittaker). Cf. n. 19, *infra.*

nation less than half of whose people believe in the death penalty,[16] a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority.[17]

If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply "neutral" with respect to penalty.[18] But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a

---

[16] It appears that, in 1966, approximately 42% of the American public favored capital punishment for convicted murderers, while 47% opposed it and 11% were undecided. Polls, International Review on Public Opinion, Vol. II, No. 3, at 84 (1967). In 1960, the comparable figures were 51% in favor, 36% opposed, and 13% undecided. *Ibid*.

[17] Compare Arthur Koestler's observation:

"The division is not between rich and poor, highbrow and lowbrow, Christians and atheists: it is between those who have charity and those who have not. . . . The test of one's humanity is whether one is able to accept this fact—not as lip service, but with the shuddering recognition of a kinship: here but for the grace of God, drop I." Koestler, Reflections on Hanging 166–167 (1956).

[18] Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt*. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence— given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution.

jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die.[19]

It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal "organized to convict." *Fay* v. *New York,* 332 U. S. 261, 294. See *Tumey* v. *Ohio,* 273 U. S. 510. It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death.[20] Specifically,

---

[19] The *amicus curiae* brief filed in this case by the American Friends Service Committee et al. notes that the number of persons under sentence of death in this country climbed from 300 at the end of 1963 to 406 at the end of 1966, while the number of persons actually executed fell from 21 in 1963 to 15 in 1964, seven in 1965, and one in 1966. The brief suggests that this phenomenon might be explained in part by society's "deep reluctance actually to inflict the death sentence" and by a widening "divergence of belief between the juries we select and society generally."

[20] It should be understood that much more is involved here than a simple determination of sentence. For the State of Illinois empowered the jury in this case to answer "yes" or "no" to the question whether this defendant was fit to live. To be sure, such a determination is different in kind from a finding that the defendant committed a specified criminal offense. Insofar as a determination that a man should be put to death might require "that there be taken into account the circumstances of the offense together with the character and propensities of the offender," *Pennsylvania* v. *Ashe,* 302 U. S. 51, 55, for example, it may be appropriate that certain rules of evidence with respect to penalty should differ from the corresponding evidentiary rules with respect to guilt. See, *e. g., Williams* v. *New York,* 337 U. S. 241. But this does not mean that basic requirements of procedural fairness can be ignored simply because the determination involved in this case differs in some respects from the traditional assessment of whether the defendant engaged in a proscribed course of conduct. See, *e. g., Specht* v. *Patterson,* 386 U. S. 605. Cf. *Mempa* v. *Rhay,* 389 U. S. 128.

One of those requirements, at least, is that the decision whether a man deserves to live or die must be made on scales that are not

we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.[21] No defendant can constitutionally be

deliberately tipped toward death. It was in part upon such a premise that the Fourth Circuit recently invalidated a North Carolina murder conviction, noting that a juror who felt it his "duty" to sentence *every* convicted murderer to death was allowed to serve in that case, "while those who admitted to scruples against capital punishment were dismissed without further interrogation." This "double standard," the court concluded, "inevitably resulted in [a] denial of due process." *Crawford* v. *Bounds*, 395 F. 2d 297, 303–304 (alternative holding). Cf. *Stroud* v. *United States*, 251 U. S. 15, 20–21; on petition for rehearing, *id.*, at 380, 381 (dictum).

[21] Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. See nn. 5 and 9, *supra*.

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to

put to death at the hands of a tribunal so selected.[22]

Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law.

*Reversed.*

MR. JUSTICE DOUGLAS.

My difficulty with the opinion of the Court is a narrow but important one. The Court permits a State to eliminate from juries some of those who have conscientious scruples against the death penalty; but it allows those to serve who have no scruples against it as well as those who, having such scruples, nevertheless are deemed able to determine after a finding of guilt whether the death

___

the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case.

[22] We have considered the suggestion, advanced in an *amicus curiae* brief filed by 27 States on behalf of Illinois, that we should "give prospective application only to any new constitutional ruling in this area," particularly since a dictum in an 1892 decision of this Court approved the practice of challenging for cause those jurors who expressed "conscientious scruples in regard to the infliction of the death penalty for crime." *Logan* v. *United States,* 144 U. S. 263, 298. But we think it clear, *Logan* notwithstanding, that the jury-selection standards employed here necessarily undermined "the very integrity of the . . . process" that decided the petitioner's fate, see *Linkletter* v. *Walker,* 381 U. S. 618, 639, and we have concluded that neither the reliance of law enforcement officials, cf. *Tehan* v. *Shott,* 382 U. S. 406, 417; *Johnson* v. *New Jersey,* 384 U. S. 719, 731, nor the impact of a retroactive holding on the administration of justice, cf. *Stovall* v. *Denno,* 388 U. S. 293, 300, warrants a decision against the fully retroactive application of the holding we announce today.

penalty or a lesser penalty should be imposed. I fail to see or understand the constitutional dimensions of those distinctions.

The constitutional question is whether the jury must be "impartially drawn from a cross-section of the community," or whether it can be drawn with systematic and intentional exclusion of some qualified groups, to use Mr. Justice Murphy's words in his dissent in *Fay* v. *New York,* 332 U. S. 261, 296.

*Fay* v. *New York,* which involved a conviction of union leaders for extortion, was the "blue ribbon" jury case in which the jury was weighted in favor of propertied people more likely to convict for certain kinds of crimes. The decision was 5–4, Mr. Justice Murphy speaking for MR. JUSTICE BLACK, Mr. Justice Rutledge, and myself:

> "There is no constitutional right to a jury drawn from a group of uneducated and unintelligent persons. Nor is there any right to a jury chosen solely from those at the lower end of the economic and social scale. But there is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions. Under our Constitution, the jury is not to be made the representative of the most intelligent, the most wealthy or the most successful, nor of the least intelligent, the least wealthy or the least successful. It is a democratic institution, representative of all qualified classes of people." *Id.,* at 299–300.

The idea that a jury should be "impartially drawn from a cross-section of the community" [1] certainly should not

---

[1] "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly repre-

mean a selection of only those with a predisposition to impose the severest sentence or with a predisposition to impose the least one that is possible.

The problem is presented in different postures under several types of state laws. Many States, including Illinois, specifically grant the jury discretion as to penalty;[2] in some, this discretion is exercised at a special penalty trial, convened after a verdict of guilt has been returned.[3] In other States, death is imposed upon a conviction of first degree murder unless the jury recommends mercy or life imprisonment,[4] although in these States the jury

---

sentative of the community." *Smith* v. *Texas,* 311 U. S. 128, 130. And see *Ballard* v. *United States,* 329 U. S. 187, 191; *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217, 220 ("The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community"); *Glasser* v. *United States,* 315 U. S. 60, 85–86.

[2] Ala. Code, Tit. 14, § 318 (1958); Ariz. Rev. Stat. Ann. § 13–453 (1956); Colo. Rev. Stat. Ann. § 40–2–3 (1963); Haw. Rev. Laws § 291–5 (1955); Idaho Code Ann. § 18–4004 (1948); Ill. Rev. Stat., c. 38, § 1–7 (c)(1) (1967); Ind. Ann. Stat. § 9–1819 (1956); Kan. Stat. Ann. § 21–403 (1964); Ky. Rev. Stat. § 435.010 (1962), Ky. Rule Crim. Proc. 9.84 (1965); Mo. Rev. Stat. § 559.030 (1959); Neb. Rev. Stat. § 28–401 (1964); Nev. Rev. Stat. § 200.030 (1963); Okla. Stat. Ann., Tit. 21, § 707 (1958); Tenn. Code Ann. § 39–2406 (1955); Tex. Pen. Code Ann., Art. 1257 (1961), Tex. Code Crim. Proc., Art. 37.07 (1967 Supp.); Va. Code Ann. §§ 18.1–22, 19.1–291 (1960). In most of these States, a jury decision of death is binding on the court. In a few States, however, the judge may overrule the jury and impose a life sentence. Ill. Rev. Stat., c. 38, § 1–7 (c)(1) (1967); *State* v. *Anderson,* 384 S. W. 2d 591 (Mo. 1964); S. D. Code § 13.2012 (1960 Supp.).

[3] Cal. Pen. Code § 190.1 (1967 Supp.); N. Y. Pen. Law §§ 125.30, 125.35 (1967); Pa. Stat., Tit. 18, § 4701 (1963). And see S. D. Code § 13.2012 (1960 Supp.) (trial court may ask jury to retire to deliberate on penalty after verdict of guilt returned).

[4] Ark. Stat. Ann. §§ 41–2227, 43–2153 (1964); Conn. Gen. Stat. Rev. § 53–10 (1965 Supp.); Del. Code Ann., Tit. 11, §§ 571, 3901

is allowed to find a lesser degree of murder (or to find manslaughter, if under state law there are no degrees of murder), if the evidence will permit, without regard to the formal charge.[5]  In some States, the death penalty is

(1966 Supp.); Fla. Stat. §§ 782.04, 919.23 (1965); Ga. Code Ann. § 26–1005 (1953); La. Rev. Stat. § 14:30 (1950); Md. Ann. Code, Art. 27, § 413 (1967); Mass. Gen. Laws Ann., c. 265, § 2 (1959); Miss. Code Ann. § 2217 (1957); Mont. Rev. Codes Ann. § 94–2505 (1949); N. J. Rev. Stat. § 2A:113–4 (1953); N. M. Stat. Ann. § 40A–29–2 (1953); N. C. Gen. Stat. § 14–17 (1953); Ohio Rev. Code Ann. § 2901.01 (1954); S. C. Code Ann. § 16–52 (1962); Utah Code Ann. § 76–30–4 (1953); Wyo. Stat. Ann. § 6–54 (1959). In two of these States, the court possesses discretion to impose a life sentence despite the failure of the jury to recommend mercy. Ga. Code Ann. § 26–1005 (1953) (if conviction based solely on circumstantial evidence); Md. Ann. Code, Art. 27, § 413 (1967). In Delaware and Utah the court may overrule a jury recommendation of life imprisonment and impose the death penalty. Del. Code Ann., Tit. 11, §§ 571, 3901 (1966 Supp.); Utah Code Ann. § 76–30–4 (1953), *State* v. *Romeo,* 42 Utah 46, 128 P. 530 (1912).

[5] Arkansas: Ark. Stat. Ann. § 43–2152 (1964); Connecticut: Conn. Gen. Stat. Rev. § 53–9 (1965 Supp.); Delaware: *State* v. *Price,* 30 Del. 544, 108 A. 385 (1919); Florida: *Brown* v. *State,* 124 So. 2d 481 (1960); Georgia: (no degrees of murder) *Graham* v. *State,* 34 Ga. App. 598, 130 S. E. 354 (1925); Louisiana: (no degrees of murder) *State* v. *Goodwin,* 189 La. 443, 179 So. 591 (1938); Maryland: Md. Ann. Code, Art. 27, § 412 (1967), and see *Chisley* v. *State,* 202 Md. 87, 95 A. 2d 577 (1953), *Gunther* v. *State,* 228 Md. 404, 179 A. 2d 880 (1962); Massachusetts: *Commonwealth* v. *Kavalauskas,* 317 Mass. 453, 58 N. E. 2d 819 (1945), *Commonwealth* v. *Di Stasio,* 298 Mass. 562, 11 N. E. 2d 799 (1937); Mississippi: (no degrees of murder) *Anderson* v. *State,* 199 Miss. 885, 25 So. 2d 474 (1946); Montana: *State* v. *Le Duc,* 89 Mont. 545, 300 P. 919 (1931), *State* v. *Miller,* 91 Mont. 596, 9 P. 2d 474 (1932); New Jersey: *State* v. *Sullivan,* 43 N. J. 209, 203 A. 2d 177 (1964), *State* v. *Wynn,* 21 N. J. 264, 121 A. 2d 534 (1956); New Mexico: *State* v. *Smith,* 26 N. M. 482, 194 P. 869 (1921); North Carolina: *State* v. *Lucas,* 124 N. C. 825, 32 S. E. 962 (1899); Ohio: *State* v. *Muskus,* 158 Ohio St. 276, 109 N. E. 2d 15 (1952); South Carolina: (no degrees of murder) *State* v. *Byrd,* 72 S. C. 104, 51 S. E. 542 (1905); Utah: *State* v. *Mewhinney,* 43 Utah 135, 134 P. 632 (1913); Wyoming: *Brantley* v. *State,* 9 Wyo. 102, 61 P. 139 (1900).

mandatory for certain types of crimes.[6]   In still others, it has been abolished either in whole or in part.[7]   And a few States have special rules which do not fit precisely into the above categories.[8]

[6] Ala. Code, Tit. 14, § 319 (1958) (person serving life term at time of commission of offense); Ariz. Rev. Stat. Ann. § 13–701 (1956) (treason); Mass. Gen. Laws Ann., c. 265, § 2 (1959) (rape murders); Miss. Code Ann. § 2397 (1957) (treason); Ohio Rev. Code Ann. §§ 2901.09, 2901.10 (1954) (murder of President, Vice-President, Governor, or Lieutenant Governor); R. I. Gen. Laws Ann. § 11–23–2 (1956) (person serving life term at time of commission of offense).

[7] Alaska Stat. § 11.15.010 (1962); Iowa Code Ann. § 690.2 (1967 Supp.); Me. Rev. Stat. Ann., Tit. 17, § 2651 (1964); Mich. Stat. Ann. § 28.548, Comp. Laws 1948, § 750.316 (1954); Minn. Stat. § 609.185 (1965); Ore. Rev. Stat. § 163.010 (1967); W. Va. Code Ann. § 61–2–2 (1966); Wis. Stat. § 940.01 (1965). In North Dakota the death penalty has been abolished except in the case of murder committed while under a life sentence for murder, in which case the death penalty may be imposed at the jury's discretion. N. D. Cent. Code §§ 12–27–13, 12–27–22 (1960). Vermont has also abolished the death penalty except in the cases of an unrelated second offense of murder or the killing of a peace officer or prison official, in which cases the death penalty may be imposed at the jury's discretion. Vt. Stat. Ann., Tit. 13, § 2303 (1967 Supp.). In Rhode Island the death penalty has been abolished except that it is mandatory in cases of murder committed while under a life sentence for murder. R. I. Gen. Laws Ann. § 11–23–2 (1956). In Georgia the death penalty may not be imposed if the person convicted was under 17 years of age at the time of the offense. Ga. Code Ann. § 26–1005 (1967 Supp.). In California it may not be imposed if the person was under 18 years of age. Cal. Pen. Code § 190.1 (1967 Supp.). In New York capital punishment has been abolished except that it may be imposed at the jury's discretion in cases of the murder of a peace officer while in the course of performing his official duties or of murder committed while under a life sentence for murder. N. Y. Pen. Law § 125.30 (1967).

[8] New Hampshire and Washington provide for life imprisonment unless the jury recommends death. N. H. Rev. Stat. Ann. § 585:4 (1955); Wash. Rev. Code § 9.48.030 (1956). Maryland permits the trial court alone to decide the penalty in its discretion without

A fair cross-section of the community may produce a jury almost certain to impose the death penalty if guilt were found; or it may produce a jury almost certain not to impose it. The conscience of the community is subject to many variables, one of which is the attitude toward the death sentence. If a particular community were overwhelmingly opposed to capital punishment, it would not be able to exercise a discretion to impose or not impose the death sentence. A jury representing the conscience of that community would do one of several things depending on the type of state law governing it: it would avoid the death penalty by recommending mercy or it would avoid it by finding guilt of a lesser offense.

In such instance, why should not an accused have the benefit of that controlling principle of mercy in the community? Why should his fate be entrusted exclusively to a jury that was either enthusiastic about capital punishment or so undecided that it could exercise a discretion to impose it or not, depending on how it felt about the particular case?

I see no constitutional basis for excluding those who are so opposed to capital punishment that they would never inflict it on a defendant. Exclusion of them means the selection of jurors who are either protagonists of the death penalty or neutral concerning it. That results in a systematic exclusion of qualified groups, and the deprivation to the accused of a cross-section of the community for decision on both his guilt and his punishment.

The Court in *Logan* v. *United States,* 144 U. S. 263, 298, held that prospective jurors who had conscientious scruples concerning infliction of the death penalty were rightly challenged by the prosecution for cause, stating

submitting the matter to the jury in cases of rape and aggravated kidnaping, Md. Ann. Code, Art. 27, §§ 461, 338 (1967).

that such jurors would be prevented "from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence. . . ." That was a federal prosecution, the requirement being "an impartial jury" as provided in the Sixth Amendment, a requirement now applicable to the States by reason of the incorporation of the Jury Clause of the Sixth Amendment into the Due Process Clause of the Fourteenth. *Duncan* v. *Louisiana, ante,* p. 145.

But where a State leaves the fixing of the penalty to the jury, or provides for a lesser penalty on recommendation of mercy by the jury, or gives the jury power to find guilt in a lesser degree, the law leaves the jury great leeway. Those with scruples against capital punishment can try the case "according to the law and the evidence," because the law does not contain the inexorable command of "an eye for an eye." Rather "the law" leaves the degree of punishment to the jury. *Logan* v. *United States* in the setting of the present case [9] does not state what I believe is the proper rule. Whether in other circumstances it states a defensible rule is a question we need not reach. Where the jury has the discretion to impose the death penalty or not to impose it, the *Logan* rule is, in my opinion, an improper one. For it results in weeding out those members of the community most likely to recommend mercy and to leave in those most likely not to recommend mercy.[10]

---

[9] The ruling on the "impartial jury" in *Logan* v. *United States,* seems erroneous on the facts and the applicable law of that case. The governing statute (a Texas statute), 144 U. S., at 264, n. 1, left to the jury "the degree of murder, as well as the punishment."

[10] "[T]he gulf between the community and the death-qualified jury grows as the populace becomes the more infected with modern notions of criminality and the purpose of punishment. Accordingly, the community support for the death verdict becomes progressively narrower, with all that this connotes for the administration of justice.

Challenges for cause and peremptory challenges do not conflict with the constitutional right of the accused to trial by an "impartial jury." No one is guaranteed a partial jury. Such challenges generally are highly individualized not resulting in depriving the trial of an entire class or of various shades of community opinion or of the "subtle interplay of influence" of one juror on another. *Ballard* v. *United States,* 329 U. S. 187, 193. In the present case, however, where the jury is given discretion in fixing punishment,[11] the wholesale exclusion of a class that makes up a substantial portion of the population [12] produces an unrepresentative jury.[13]

---

Moreover, as the willingness to impose the death penalty—that is, *to be sworn as a juror in a capital case*—wanes in a particular community, the prejudicial effect of the death-qualified jury upon the issue of guilt or innocence waxes; to man the capital jury, the resort must increasingly be to the extremists of the community—those least in touch with modern ideas of criminal motivation, with the constant refinement of the finest part of our cultural heritage, the dedication to human charity and understanding. The due-process implications of this flux seem obvious. Yesterday's practice becomes less and less relevant to today's problem."

Oberer, Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on Issue of Guilt?, 39 Tex. L. Rev. 545, 556–557 (1961).

[11] In the words of the Illinois Supreme Court, the death penalty is "an optional form of punishment which [the jury is] free to select or reject as it [sees] fit." *People* v. *Bernette,* 30 Ill. 2d 359, 370, 197 N. E. 2d 436, 443 (1964). See also *People* v. *Dukes,* 12 Ill. 2d 334, 146 N. E. 2d 14 (1957); *People* v. *Weisberg,* 396 Ill. 412, 71 N. E. 2d 671 (1947); *People* v. *Martellaro,* 281 Ill. 300, 117 N. E. 1052 (1917).

[12] As the Court points out, a substantial number of the veniremen (47 out of 95), who we may assume represented a fair cross-section of the community, were excluded because of their opposition to the death penalty.

[13] In *Rudolph* v. *Alabama,* 375 U. S. 889, I joined the opinion of Mr. Justice Goldberg, dissenting from the Court's denial of certiorari,

Although the Court reverses as to penalty, it declines to reverse the verdict of guilt rendered by the same jury. It does so on the ground that petitioner has not demonstrated on this record that the jury which convicted him was "less than neutral with respect to *guilt*," *ante,* at 520, n. 18, because of the exclusion of all those opposed in some degree to capital punishment. The Court fails to find on this record "an unrepresentative jury on the issue of guilt." *Ante,* at 518. But we do not require a showing of specific prejudice when a defendant has been deprived of his right to a jury representing a cross-section of the community. See *Ballard* v. *United States,* 329 U. S. 187, 195; *Ware* v. *United States,* 123 U. S. App. D. C. 34, 356 F. 2d 787 (1965). We can as easily assume that the absence of those opposed to capital punishment would rob the jury of certain peculiar qualities of human nature as would the exclusion of women from juries. *Ballard* v. *United States,* 329 U. S., at 193–194. I would not require a specific showing of a likelihood of prejudice, for I feel that we must proceed on the assumption that in many, if not most, cases of class exclusion on the basis of beliefs or attitudes some prejudice does result and many times will not be subject to precise measurement. Indeed, that prejudice "is so subtle, so intangible, that it escapes the ordinary methods of proof." *Fay* v. *New*

who expressed the view that this Court should consider the question whether the Eighth Amendment prohibits "the imposition of the death penalty on a convicted rapist who has neither taken nor endangered human life." *Ibid.* In contrast, the instant case concerns a convicted murderer who has been sentenced to death for his crime. The requirement imposed by the Sixth and the Fourteenth Amendments that a jury be representative of a cross-section of the community is, of course, separate and distinct from the question whether the death penalty offends the Eighth Amendment.

*York,* 332 U. S., at 300 (dissenting opinion). In my view, that is the essence of the requirement that a jury be drawn from a cross-section of the community.

MR. JUSTICE BLACK, with whom MR. JUSTICE HARLAN and MR. JUSTICE WHITE join, dissenting.

The Court closes its reversal of this murder case with the following graphic paragraph:

> "Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution. The State of Illinois has stacked the deck against the petitioner. To execute this death sentence would deprive him of his life without due process of law."

I think this charge against the Illinois courts is completely without support in the record. The opinion affirming this conviction for a unanimous Illinois Supreme Court was written by Justice Walter Schaefer, a judge nationally recognized as a protector of the constitutional rights of defendants charged with crime. It seems particularly unfortunate to me that this Court feels called upon to charge that Justice Schaefer and his associates would let a man go to his death after the trial court had contrived a "hanging jury" and, in this Court's language, "stacked the deck" to bring about the death sentence for petitioner. With all due deference it seems to me that one might much more appropriately charge that this Court has today written the law in such a way that the States are being forced to try their murder cases with biased juries. If this Court is to hold capital punishment unconstitutional, I think it should do so forthrightly, not by making it impossible for States to get juries that will enforce the death penalty.

Now to the case.

On April 29, 1959, *more than nine years ago,* petitioner shot and killed a policeman in order to escape arrest. Petitioner had been struggling on the street with a woman whom he had met in a tavern when a police patrol car assigned to the vicinity stopped at a nearby traffic light. The woman was able to free herself from petitioner's grasp and rushed to the patrol car where she told the two policemen in it that petitioner was carrying a gun. Petitioner overheard this conversation and fled to a nearby parking lot and hid in one of the many parked trailers and tractors. It was while one of the policemen was searching this trailer that petitioner shot him. There is no doubt that petitioner killed the policeman since the dying officer himself identified petitioner at the hospital, and petitioner later lectured the police on using such young and inexperienced officers. And as I read the majority's opinion, even those who agreed to it are unwilling to cast any doubt on petitioner's conviction. See n. 21, majority opinion.

At his trial for murder petitioner was represented by three appointed counsel, the chief of whom was the then Chairman of the Chicago Bar Association Committee for the Defense of the Indigent. It is important to note that when those persons who acknowledged having "conscientious or religious scruples against the infliction of the death penalty" were excluded from the jury, defense counsel made no attempt to show that they were nonetheless competent jurors. In fact, when the jurors finally were accepted by defense counsel, the defense still had three peremptory challenges left to exercise. In the past this has frequently been taken as an indication that the jurors who were impaneled were impartial. See cases collected in *United States* v. *Puff,* 211 F. 2d 171, 185 (C. A. 2d Cir. 1954). And it certainly amounts to a clear showing that in this case petitioner's able and dis-

tinguished counsel did not believe petitioner was being tried by a biased, much less a "hanging," jury.

After petitioner's conviction, another very distinguished attorney was appointed to prosecute his appeal, and an extensive brief alleging some 15 separate trial errors was filed in the Supreme Court of Illinois. Again, however, there was no indication that anyone thought petitioner had been convicted by a biased jury. On March 25, 1963, the Supreme Court of Illinois affirmed petitioner's conviction in a lengthy opinion. *People* v. *Witherspoon,* 27 Ill. 2d 483, 190 N. E. 2d 281. Petitioner attacked his conviction by pursuing both habeas corpus relief and the statutory post-conviction remedy. Again no mention was made of any alleged bias in the jury. When the Supreme Court of Illinois on January 17, 1964, refused the requested relief, petitioner sought federal habeas corpus, and was assisted by a third court-appointed attorney. As in his previous attacks no claim was made that petitioner was denied an impartial jury. Petitioner was unsuccessful in this federal habeas corpus bid, *Witherspoon* v. *Ogilvie,* 337 F. 2d 427 (C. A. 7th Cir. 1964), and we denied certiorari. *Witherspoon* v. *Ogilvie,* 379 U. S. 950. Then in February 1965, petitioner filed a petition in the state courts requesting whatever form of remedy is "provided for by Illinois law." Among other claims, now appeared the contention that petitioner's constitutional rights were violated when the trial court excused for cause prospective jurors having scruples against capital punishment. The state trial judge dismissed the petition on the ground that it failed to set forth facts sufficient to entitle the petitioner to relief. Petitioner then appealed to the Illinois Supreme Court where he was appearing for the third time in this case and where, more than six years after his trial, he argued that the disqualification for cause of jurors having

conscientious or religious scruples against capital punishment was unconstitutional.[1] That court disallowed petitioner's claim concluding that "we adhere to the system in which each side is allowed to examine jurors and eliminate those who can not be impartial." 36 Ill. 2d, at 476, 224 N. E. 2d, at 262. This Court subsequently granted certiorari to review the decision of the Illinois Supreme Court.

At the time of petitioner's trial, § 743 of Ill. Rev. Stat., c. 38, provided:

> "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same."

The obvious purpose of this section is to insure, as well as laws can insure such a thing, that there be an impartial jury in cases in Illinois where the death sentence may be imposed. And this statute recognizes that the people as a whole, or as they are usually called, "society" or "the state," have as much right to an impartial jury as do criminal defendants. This Court itself has made that quite clear:

> "It is to be remembered that such impartiality requires not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held." *Hayes* v. *Missouri,* 120 U. S. 68, 70.

See also *Swain* v. *Alabama,* 380 U. S. 202, 219–220.

As I see the issue in this case, it is a question of plain bias. A person who has conscientious or religious scru-

---

[1] Certainly long delays in raising objections to trial proceedings should not be condoned except to prevent intolerable miscarriages of justice. Cf. *Fay* v. *Noia,* 372 U. S. 391.

ples against capital punishment will seldom if ever vote to impose the death penalty. This is just human nature, and no amount of semantic camouflage can cover it up. In the same manner, I would not dream of foisting on a criminal defendant a juror who admitted that he had conscientious or religious scruples against not inflicting the death sentence on any person convicted of murder (a juror who claims, for example, that he adheres literally to the Biblical admonition of "an eye for an eye"). Yet the logical result of the majority's holding is that such persons must be allowed so that the "conscience of the community" will be fully represented when it decides "the ultimate question of life or death." While I have always advocated that the jury be as fully representative of the community as possible, I would never carry this so far as to require that those biased against one of the critical issues in a trial should be represented on a jury. I still subscribe to the words of this Court written over 75 years ago in *Logan* v. *United States,* 144 U. S. 263, 298:

> "As the defendants were indicted and to be tried for a crime punishable with death, those jurors who stated on *voir dire* that they had 'conscientious scruples in regard to the infliction of the death penalty for crime' were rightly permitted to be challenged by the government for cause. A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror. This court has accordingly held that a person who has a conscientious belief that polygamy is rightful may be challenged for cause on a trial for polygamy. *Reynolds* v. *United States,* 98 U. S. 145, 147, 157; *Miles* v. *United States,* 103 U. S. 304, 310. And the principle has been applied to

the very question now before us by Mr. Justice Story in *United States* v. *Cornell,* 2 Mason, 91, 105, and by Mr. Justice Baldwin in *United States* v. *Wilson,* Baldwin, 78, 83, as well as by the courts of every State in which the question has arisen, and by express statute in many States. Whart. Crim. Pl. (9th ed.) § 664."

The majority opinion attempts to equate those who have conscientious or religious scruples against the death penalty with those who do not in such a way as to balance the allegedly conflicting viewpoints in order that a truly representative jury can be established to exercise the community's discretion in deciding on punishment. But for this purpose I do not believe that those who have conscientious or religious scruples against the death penalty and those who have no feelings either way are in any sense comparable. Scruples against the death penalty are commonly the result of a deep religious conviction or a profound philosophical commitment developed after much soul-searching. The holders of such scruples must necessarily recoil from the prospect of making possible what they regard as immoral. On the other hand, I cannot accept the proposition that persons who do not have conscientious scruples against the death penalty are "prosecution prone." [2] With regard to this group, I would agree with the following statement of the Court of Appeals for the District of Columbia Circuit:

"No proof is available, so far as we know, and we can imagine none, to indicate that, generally speaking, persons not opposed to capital punishment are so bent in their hostility to criminals as to be incapable of rendering impartial verdicts on the law and the evidence in a capital case. Being not op-

---

[2] See *Bumper* v. *North Carolina, post,* p. 554 (dissenting opinion).

posed to capital punishment is not synonymous with favoring it. Individuals may indeed be so prejudiced in respect to serious crimes that they cannot be impartial arbiters, but that extreme is not indicated by mere lack of opposition to capital punishment. The two antipathies can readily coexist; contrariwise either can exist without the other; and, indeed, neither may exist in a person. It seems clear enough to us that a person or a group of persons may not be opposed to capital punishment and at the same time may have no particular bias against any one criminal or, indeed, against criminals as a class; people, it seems to us, may be completely without a controlling conviction one way or the other on either subject. . . ." *Turberville* v. *United States,* 112 U. S. App. D. C. 400, 409–410, 303 F. 2d 411, 420–421 (1962), cert. denied, 370 U. S. 946.

It seems to me that the Court's opinion today must be read as holding just the opposite from what has been stated above. For no matter how the Court might try to hide it, the implication is inevitably in its opinion that people who do not have conscientious scruples against the death penalty are somehow callous to suffering and are, as some of the commentators cited by the Court called them, "prosecution prone." This conclusion represents a psychological foray into the human mind that I have considerable doubt about my ability to make, and I must confess that the two or three so-called "studies" cited by the Court on this subject are not persuasive to me.

Finally, I want to point out that the *real* holding in this case is, at least to me, very ambiguous. If we are to take the opinion literally, then I submit the Court today has decided nothing of substance, but has merely indulged itself in a semantic exercise. For as I read the

opinion, the new requirement placed upon the States is that they cease asking prospective jurors whether they have "conscientious or religious scruples against the infliction of the death penalty," but instead ask whether "they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them." (See majority opinion, n. 21.) I believe that this fine line the Court attempts to draw is based on a semantic illusion and that the practical effect of the Court's new formulation of the question to be asked state juries will not produce a significantly different kind of jury from the one chosen in this case. And I might add that the States will have been put to a great deal of trouble for nothing. Yet, as I stated above, it is not clear that this is all the Court is holding. For the majority opinion goes out of its way to state that in some future case a defendant might well establish that a jury selected in the way the Illinois statute here provides is "less than neutral with respect to *guilt.*" (Majority opinion, n. 18.) This seems to me to be but a thinly veiled warning to the States that they had better change their jury selection procedures or face a decision by this Court that their murder convictions have been obtained unconstitutionally.

I believe that the Court's decision today goes a long way to destroying the concept of an impartial jury as we have known it. This concept has been described most eloquently by Justice Story:

> "To insist on a juror's sitting in a cause when he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt,

the proceedings of courts of justice. We do not sit here to produce the verdicts of partial and prejudiced men; but of men, honest and indifferent in causes. This is the administration of justice [which is required]." *United States* v. *Cornell,* 25 Fed. Cas. 650, 655–656 (No. 14,868) (1820).

It is just as necessary today that juries be impartial as it was in 1820 when Justice Story made this statement. I shall not contribute in any way to the destruction of our ancient judicial and constitutional concept of trial by an impartial jury by forcing the States through "constitutional doctrine" laid down by this Court to accept jurors who are bound to be biased. For this reason I dissent.

MR. JUSTICE WHITE, dissenting.

The Court does not hold that imposition of the death penalty offends the Eighth Amendment. Nor does it hold that a State Legislature may not specify only death as the punishment for certain crimes, so that the penalty is imposed automatically upon a finding of guilt, with no discretion in judge or jury. Either of these holdings might furnish a satisfactory predicate for reversing this judgment. Without them, the analytic basis of the result reached by the Court is infirm; the conclusion is reached because the Court says so, not because of reasons set forth in the opinion.

The Court merely asserts that this legislative attempt to impose the death penalty on some persons convicted of murder, but not on everyone so convicted, is constitutionally unsatisfactory:

"It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' It requires but a short step from that principle to hold, as we do today, that a State may not entrust

the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Ante,* at 521. (Citations and footnote omitted.)

The sole reason connecting the two sentences is the raw assertion that the situations are closely related. Yet the Constitution, which bars a legislative determination that everyone indicted should be convicted, and so requires the judgment of a guilt-determining body unprejudiced as to the result,[1] speaks in entirely different terms to the determination of sentence, even when that sentence is death. The Court does not deny that the legislature can impose a particular penalty, including death, on all persons convicted of certain crimes. Why, then, should it be disabled from delegating the penalty decision to a group who will impose the death penalty more often than would a group differently chosen?

All Illinois citizens, including those who oppose the death penalty, are assured by the Constitution a fair opportunity to influence the legislature's determinations about criminal sentences. *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and succeeding cases. Those opposing the death penalty have not prevailed in that forum, however. The representatives of the people of Illinois have determined that the death penalty decision should be made in individual cases by a group of those citizens without conscientious scruples about one of the sentencing alternatives provided by the legislature. This method of implementing the majority's will was presumably related to a desire to preserve the traditional policy of requiring

---

[1] While I agree generally with the opinion of MR. JUSTICE BLACK, and so have joined it, I would not wholly foreclose the possibility of a showing that certain restrictions on jury membership imposed because of jury participation in penalty determination produce a jury which is not constitutionally constituted for the purpose of determining guilt.

that jury verdicts be unanimous. The legislature undoubtedly felt that if all citizens could serve on the jury, and if one citizen with especially pronounced "scruples" could prevent a decision to impose death, the penalty would almost never be imposed.[2]  We need not decide today whether any possible delegation of the sentencing decision, for example a delegation to the surviving relatives of the victim, would be constitutionally impermissible because it would offend the conscience of civilized men, *Rochin* v. *California,* 342 U. S. 165, 172 (1952). The delegation by Illinois, which merely excludes those with doubts in policy about one of the punishments among which the legislature sought to have them choose, seems an entirely reasonable and sensible legislative act.

The Court may have a strong dislike for this particular sentence, and it may desire to meet Mr. Koestler's standards of charity.  Those are laudable motives, but hardly a substitute for the usual processes of reasoned analysis. If the Court can offer no better constitutional grounds for today's decision than those provided in the opinion, it should restrain its dislike for the death penalty and leave the decision about appropriate penalties to branches of government whose members, selected by popular vote, have an authority not extended to this Court.

---

[2] The States should be aware of the ease with which they can adjust to today's decision. They continue to be permitted to impose the penalty of death on all who commit a particular crime. And replacing the requirement of unanimous jury verdicts with majority decisions about sentence should achieve roughly the same result reached by the Illinois Legislature through the procedure struck down today.