STATE OF NORTH CAROLINA v. CHARLES LEON KIRBY
No. 48

(Filed 6 January 1970)

**1. Criminal Law § 166— exceptions — assignments of error — the brief**
    Exceptions and assignments of error not discussed in the brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

**2. Criminal Law § 161— assignments of error — form and sufficiency**
    Although the circumstances of each case must largely dictate the form of an assignment of error, the assignment should clearly present and specifically point out the alleged error relied upon without the necessity of going beyond the assignment itself to ascertain the question to be debated.

**3. Criminal Law § 146; Appeal and Error § 24— rules of the Supreme Court — nature and purpose**
    The Rules of the Supreme Court have been dictated by experience and stem from a desire to expedite the public business; they are designed to enable the Court to grasp more quickly the questions involved and to help it follow the assignments of counsel more intelligently.

**4. Criminal Law § 146; Appeal and Error § 24— Supreme Court — mandatory rules**
    The Rules of the Supreme Court are mandatory and will be enforced.

**5. Criminal Law § 161— assignment of error — form and sufficiency**
    A mere reference in the assignment of error to the record page where the asserted error may be discovered fails completely to comply with Rules 19(3) and 21, Rules of Practice in the Supreme Court.

**6. Criminal Law § 161— broadside assignment of error**
    An assignment of error based on numerous exceptions and presenting

several questions of law — none of which are set out in the assignment itself — is broadside and ineffective.

**7. Criminal Law § 163— assignment of error to the charge**

Assignments of error to the charge should quote the portion of the charge to which appellant objects, and assignments based on failure to charge should set out appellant's contention as to what the court should have charged.

**8. Criminal Law § 161— assignment of error to jury selection**

Assignment of error to the examination and selection of jurors, which referred to 152 pages of *voir dire* examination without specifying a single instance in which a juror was improperly excused, is ineffective.

**9. Criminal Law § 162— assignment of error — restrictions on cross-examination**

Assignment of error relating to restrictions placed on defendant's cross-examination of the State's witnesses is ineffectual where it does not contain any question put to any witness on cross-examination.

**10. Criminal Law § 169— exclusion of evidence — prejudicial error — failure to show witness' answer**

Where the record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial; this rule also applies to questions asked on cross-examination.

**11. Criminal Law § 127— motion in arrest of judgment — nature and purpose**

A motion in arrest of judgment is one made after verdict and to prevent entry of judgment and is based upon the insufficiency of the indictment or some other fatal defect appearing on the face of the record.

**12. Criminal Law § 127— arrest of judgment — fatal error on face of record**

A judgment in a criminal prosecution may be arrested when, and only when, some fatal error or defect appears on the face of the record proper.

**13. Criminal Law § 127— motion in arrest of judgment — allowable in Supreme Court**

A motion in arrest of judgment for a defect appearing on the face of the record proper may be made at any time, even in the Supreme Court on appeal; and, in the absence of such motion, the Court *ex mero motu* will examine the record proper for such defect.

**14. Criminal Law § 161; Appeal and Error § 26— exception to the judgment — scope of review**

An exception to the judgment presents the face of the record for review, but review is ordinarily limited to the question of whether error of law appears on the face of the record and whether the judgment is regular in form.

MOORE, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Burgwyn, E.J.*, at the 2 December 1968 Session of ONSLOW Superior Court.

Defendant was tried upon a bill of indictment charging that on 20 April 1968 Charles Leon Kirby and Raynaldo P. Trevino, with force and arms, unlawfully, willfully, feloniously, with premeditation and deliberation, and with malice aforethought, did kill and murder Raymond LaCourse while engaged in the perpetration of the crime of robbery. Although there was a joint indictment, the solicitor elected to try the defendants separately.

Defendant was convicted of murder in the first degree with recommendation that his punishment be life imprisonment. Judgment was pronounced accordingly and defendant appealed.

## THE STATE'S EVIDENCE

Kirby and Trevino were members of the Marine Corps and stationed at Camp Lejeune near Jacksonville, North Carolina. Raymond LaCourse operated a place of business in Jacksonville known as Ray's Variety Store. He customarily closed his store at 11-11:30 p.m., put his daily receipts in a "brown leather pouch bag," called his wife when he was ready to leave, then left the store, entered his car parked at the rear, and drove home.

Raynaldo P. Trevino testified as a witness for the State. His testimony tends to show that defendant Kirby owned a two-door RT Dodge with a black vinyl top and a yellow bottom. On 20 April 1968 he and defendant rode around together in defendant's car. They passed Ray's Variety Store a time or two, then parked the car a little before 10 p.m. on a dirt road on the edge of a lawn one and a half blocks from the store. They walked by the store two or three times waiting for all the customers to leave. When the customers had gone they went to the rear of the store where a white Oldsmobile belonging to Mr. LaCourse was parked. Kirby instructed Trevino to check the car doors to see if they were unlocked. Trevino did so and found the door on the passenger side locked but the door on the driver's side unlocked. Kirby directed Trevino to enter the car from the driver's side and unlock the door on the other side. Trevino did so and then took a position in front of the car. Kirby took a position on the passenger's side of the car, leaning down while Trevino was stooping down in front. Mr. LaCourse came out of the store, opened the car door on the driver's side and seated himself under the wheel. Kirby then opened the door on the passenger's side, shot Mr. LaCourse and told Trevino to grab the money bag. Mr. LaCourse screamed about the time he was shot. Kirby and Trevino

ran from the scene, entered Kirby's car with Kirby under the wheel and drove to the Second Tank Battalion barracks on the Marine Base where they lived. Kirby had wrapped the money and the pistol in a coat and put it under the car seat. At Kirby's direction, Trevino took it and placed it in Kirby's wall locker. About five minutes later the two of them took the money bag to a rest room where they divided the money. Trevino received about $300 in tens, twenties and ones which Kirby handed to him.

Trevino had requested a fifteen-day leave a week before the robbery, and the morning following the robbery, which was Sunday, Kirby woke Trevino and drove him to the airport in Greensboro. There Trevino took a plane to Chicago and from Chicago to Los Angeles where his mother lived. He stayed in Los Angeles fifteen days, returned to North Carolina by plane and reached Camp Lejeune on 6 May 1968.

Jean LaPlace, a Warrant Officer in the Marine Corps, was living in a trailer directly behind Ray's Variety Store on 20 April 1968. About 10:40 p.m. he heard a shot followed by a loud scream. He ran out on the porch, saw no one, but heard a moaning sound which led him to Mr. LaCourse's car. The door to the driver's side of the car was open, the motor was running, and the lights were on. Mr. LaCourse was lying alongside the car, his head about six feet from the rear door of the store. His eyes were open and he appeared to be in a deep shock. No heartbeat could be detected. Officers were called and in due course an ambulance removed the body from the scene.

On the night of 20 April 1968 at approximately 10:30 p.m., Ronald Parker saw a "yellow RT with a black vinyl top and a bumblebee stripe" parked on Lake Drive at the edge of Roger Daltry's yard about two blocks from Ray's Variety Store. He later saw defendant's car at the courthouse and identified it as the same car.

Donald White rode along Lake Drive on the night of 20 April 1968 and saw a yellow Dodge RT parked in the corner of Roger Daltry's yard. The car had "a yellow bottom and a black vinyl top and a bumblebee stripe, a 1968 model." The following Monday he saw defendant's car at the courthouse and "it looked like the same car."

Marland Sanders, Service Manager at Padgett Motor Company in Jacksonville, had been servicing defendant's car — a yellow RT Dodge with a black vinyl top and a bumblebee stripe, 1968 model. That car was at Padgett Motor Company from Wednesday to Fri-

·day (April 17-19, 1968) being serviced. It had three standard tread ·tires and, on the left rear wheel, one racing slick tire. A blown out tire and a second racing slick tire were in the trunk. The car was picked up on Friday night about 7 p.m.

Bobby Smith, a member of the Marine Corps, borrowed defendant's car about 6 p.m. on 20 April 1968 and returned it about 9 p.m. on that date. It was a yellow and black 1968 RT Dodge and had a racing slick tire on the left rear wheel.

While searching for clues about 2:30 a.m. following Mr. La-Course's death, officers found a set of tire tracks on the edge of Roger Daltry's yard and on the left side of Lake Drive. These tracks showed one track to have been made by a slick tire. The tracks were photographed and the photographs were offered in evidence to illustrate the testimony of the witnesses.

Five fingerprints and palm prints lifted from the hood and window of Mr. LaCourse's Oldsmobile on the night he was murdered were, in the opinion of experts who testified at the trial, identical with the fingerprints and palm prints of defendant Kirby; and three such fingerprints and palm prints lifted from the Oldsmobile were identical with Trevino's.

## DEFENDANT'S EVIDENCE

Charles Leon Kirby, a witness in his own behalf, testified that he had been in the Marine Corps for three and one-half years. On 20 April 1968 he was Corporal of the Guard, Second Tank Battalion and was on duty from 4 to 8 p.m. He loaned his car to Bobby Smith on that date and it was returned to him at approximately 9:15 p.m. in front of the Guard Shack where ten to fifteen other Marines were present. He had previously loaned his car to Raynaldo Trevino, and when it was returned by Bobby Smith at 9:15 p.m. on 20 April 1968, he again loaned it to Trevino at approximately 9:30 p.m. He turned the key over to Trevino in front of the Guard Shack and does not know where Trevino went. Trevino said he was going to the Service Battalion on the other side of the Base to see a friend because he needed some money. He next saw Trevino the following morning ·at approximately 7:30 a.m. when the Sergeant of the Guard directed his attention to the fact that Trevino had just come through the battalion area stripping the gears of the car. He went to where Trevino had parked the car, got the keys, and criticized Trevino for stripping the gears.

Between 8 p.m. on the night of April 20 and 8 a.m. on the morning of April 21, he (Kirby) did not leave Camp Lejeune. During

those hours he saw various people in the Guard Shack, went to the NCO Club and listened to the band, and listened to music in the Guard Shack where a record player was kept. He went to sleep in the Guard Shack at approximately 11 p.m. on the night of April 20, awoke at 4 a.m. on the morning of April 21 to go on guard duty, and signed in as Corporal of the Guard at that time. He was then on guard duty until 8 a.m. when he signed out as Corporal of the Guard.

Defendant Kirby further testified that there is another 1968 Dodge automobile in Jacksonville just like the one he owns. His car has been serviced by Padgett Motors several times. He had three regular tires and one racing slick tire on his car but noticed one of the regular tires leaking air and replaced it with a second racing slick tire on 19 April 1968. His car therefore had two racing slick tires on 20 April 1968 when he loaned it to Trevino.

He never had any discussion with Trevino about robbing any place. He did not know where Ray's Variety Store was located on 20 April 1968. He has never been on Lake Drive. He has never shared money received from a robbery with Raynaldo Trevino or anyone else. He voluntarily told the officers when questioned that he had loaned his car on the date in question and furnished names of the borrowers. The first time he knew that Trevino had accused him of participating in a robbery and murder was when Trevino testified at the preliminary hearing. The first time he knew he was a suspect was about 26 April 1968 when the officers told him so and stated they were going to call his battalion commander and request permission to lock him and Bobby Smith up for safekeeping until they could get Trevino back from California. He thereupon went to a phone booth and called his mother in Philadelphia and informed her that his car was involved in a serious investigation, that "they" were not being very fair about it, and that they were threatening to lock him up and he would not be able to get a fair trial. The following day he went home to explain the situation and saw Lawyer Coffman while there. At 6 a.m. on Sunday morning, 28 April 1968, he was arrested at his mother's home in Philadelphia. As a result of the advice given him by his uncle and by Lawyer Coffman, he was preparing to return to Camp Lejeune at the time he was arrested. Except for traffic tickets, he has never been convicted of any crime.

Melvin D. Brown testified that on 20 April 1968 he knew Charles Leon Kirby and was familiar with Kirby's 1968 RT Dodge automobile. He was present when the car was returned by Bobby Smith.

On the night of 20 April 1968 defendant relieved Melvin D. Brown twice as Corporal of the Guard — at 4 p.m. on the evening of the 20th and at 4 a.m. on the morning of the 21st. He and defendant were together at the Guard Shack and defendant was waiting for his car to be returned. After his car was returned sometime after 9 p.m. on April 20, they played records in the Guard Shack for awhile, went over to the NCO Club where a band was playing and couples were dancing, and later returned to the Guard Shack. There the witness Brown prepared for bed and engaged in conversation with defendant until he eventually went to sleep. He does not know how long he slept but states definitely that he was with defendant Kirby between 9 p.m. on April 20 and the time he finally went to sleep.

Lt. William H. Smathers, with the Second Tank Battalion at Camp Lejeune, testified that defendant was in his platoon and that defendant's general reputation and character in the Camp Lejeune community are very good.

Percy Kirby, defendant's uncle, testified that while he was in Newark, New Jersey, in April 1968 defendant talked to him by telephone. "He called and told me that there had been a robbery in Jacksonville and the people were trying to railroad him and so he ran and came home. Got afraid and came home. . . . I found out he was arrested in the process of coming back to Camp Lejeune."

Defendant's motion for judgment of nonsuit at the close of all the evidence was denied, and the case was submitted to the jury. From judgment of life imprisonment pronounced upon the verdict, defendant appealed.

*Arthur L. Lane, Attorney for the defendant appellant.*

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General; Andrew A. Vanore, Jr., Staff Attorney, for the State.*

HUSKINS, J.

[1] The record in this case, including the appendix, consists of 352 pages and contains 149 exceptions. These exceptions have been assembled into fifteen groups labeled "Assignments of Error." In the brief filed here, defendant's attorney has discussed only eight groups. All other exceptions and assignments are deemed abandoned. *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322; Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783. We quote the first assignment as illustrative of the eight groups discussed in the brief:

"GROUP I — EXCEPTIONS NOS. 6 (R p 25), 7 (R pp 25-26), 8 (R p 29), 9 (R p 30), 10 (R pp 31-32), 11 (R p 39), 12, 13 (R p 40), 14 (R pp 40-41), 15 (R p 41), 16 (R p 45), 17 (R pp 45-46), 18 (R p 46), 19 (R pp 46-47), 20 (R p 47), 21, 22 (R p 48), 23 (R pp 50-51), 24 (R p 52), 25 (R p 53), 26 (R pp 55-56), 27 (R pp 56-57), 28 (R p 59), 29 (R pp 61-62), 30 (R p 62), 31 (R pp 64-65), 32 (R p 66), 33 (R p 67), 34 (R pp 68-69), 35, 36 (R p 71), 37, 38 and 39 (R p 72).

"The court below allowed prejudicial, irrelevant and immaterial evidence to be adduced in the presence of the jury to the prejudice of the defendant, and these for the Appellant are EXCEPTIONS NOS. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, and 39."

The second and third assignments are identical with the first except that different numbered exceptions are listed therein.

[2]    While the circumstances of each case must largely dictate the form of an assignment of error, the assignment should clearly present and specifically point out the alleged error relied upon without the necessity of going beyond the assignment itself to ascertain the question to be debated. *Gilbert v. Moore,* 268 N.C. 679, 151 S.E. 2d 577; *Long v. Honeycutt,* 268 N.C. 33, 149 S.E. 2d 579. "The assignment must be so specific that the Court is given some real aid and a voyage of discovery through an often voluminous record not rendered necessary." *Thompson v. R. R.,* 147 N.C. 412, 61 S.E. 286.

As aptly stated in *McDowell v. Kent,* 153 N.C. 555, 69 S.E. 626, "[w]hat the Court desires, and indeed the least that any appellate court requires, is that the exceptions which are *bona fide . . .* shall be stated clearly and intelligibly by the assignment of errors and not by referring to the record, and therewith shall be set out so much of the evidence or of the charge or other matter or circumstance (as the case may be) as shall be necessary to present clearly the matter to be debated."

[3, 4]    The Rules of the Supreme Court have been dictated by experience and stem from a desire to expedite the public business. They are designed to enable the court to grasp more quickly the questions involved and to help it follow the assignments of counsel more intelligently. These rules are mandatory and will be enforced. *Walter Corp. v. Gilliam,* 260 N.C. 211, 132 S.E. 2d 313; *Pamlico County v. Davis,* 249 N.C. 648, 107 S.E. 2d 306; *Hunt v. Davis,* 248 N.C. 69, 102 S.E. 2d 405; *Pruitt v. Wood,* 199 N.C. 788, 156 S.E. 126.

**[5]**   Since the Rules require that assignments of error specifically show within themselves the questions sought to be presented, it follows, therefore, that a mere reference in the assignment of error to the record page where the asserted error may be discovered — defendant's procedure here — fails completely to comply with Rules 19(3) and 21, Rules of Practice in the Supreme Court, 254 N.C. 783. *In Re Will of Adams,* 268 N.C. 565, 151 S.E. 2d 59; *Steelman v. Benfield,* 228 N.C. 651, 46 S.E. 2d 829.

Twenty-two alleged errors in the charge are presented under "Group V" in the following language:

> "GROUP V — EXCEPTIONS NOS. 132 (R p 174), 135 (R pp 175-176), 136 (R p 176), 137 (R p 177), 138, 139 (R p 178), 140 (R p 179), 141 (R pp 179-180), 142, 143 (R p. 180), 144 (R p 181), 144A, 144B (R p 182), 144C, 144D (R p 183), 144E (R pp 183-184), 144F (R p 184), 144G (R p 185), 144H (R pp 185-186), 144I (R p 186), 144J (R p 187), and 144K (R p 188).

> "The court erroneously charged the jury as to the facts, law and evidence produced in the case to the prejudice of the defendant, and this for the appellant is EXCEPTIONS NOS. 132, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 144A, 144B, 144C, 144D, 144E, 144F, 144G, 144H, 144I, 144J, and 144K."

**[6]**   This assignment — like a hoopskirt — covers everything and touches nothing. It is based on numerous exceptions and attempts to present several separate questions of law — none of which are set out in the assignment itself — thus leaving it broadside and ineffective. "An assignment which attempts to raise several different questions is broadside." *Hines v. Frink and Frink v. Hines,* 257 N.C. 723, 127 S.E. 2d 509.

**[7]**   Assignments of error to the charge should quote the portion of the charge to which appellant objects, and assignments based on failure to charge should set out appellant's contention as to what the court should have charged. *State v. Wilson,* 263 N.C. 533, 139 S.E. 2d 736. "When an exception relates to the charge, that portion to which the exception is taken must be set out in the particular assignment of error. A mere reference to the exception number and the page number of the record where the exception appears . . . will not present the alleged error for review. *Pratt v. Bishop,* 257 N.C. 486, 499, 126 S.E. 2d 597, 607; *Darden v. Bone,* 254 N.C. 599, 601, 119 S.E. 2d 634, 636; *Lowie & Co. v. Atkins,* 245 N.C. 98, 95

S.E. 2d 271." *Samuel v. Evans and Cooper v. Evans,* 264 N.C. 393, 141 S.E. 2d 627.

[8]    Defendant's next assignment discussed in the brief is labeled "Group XIII." Under it is the following language: "The court below erred in excusing for cause all jurors with conscientious scruples against the imposition of the death penalty and this for the appellant is Exception No. 4. This error is presented and preserved in Exception No. 4 (R p 24)." We turn to page 24 of the record and it directs us to "See Appendix" for "questions propounded and jurors excused for cause as set forth in the Record." Following this lead we successfully locate the "Appendix to Record." It begins on page 198 and continues for 152 pages! Somewhere in those 152 pages, defendant says, prospective jurors were excused for cause on the ground that they had conscientious scruples against the imposition of the death penalty. We are not furnished with the name of a single juror who was thus excused, nor the page where such action is recorded, nor the voir dire examination which produced such result. With respect to each juror allegedly erroneously excused, this examination should have been lifted from the record and quoted in the assignment itself.

This Appendix contains the voir dire examination of *every juror* questioned by the solicitor for the State and by counsel for defendant — including all those excused both peremptorily and for cause by defendant himself! Nevertheless, we have tediously examined this entire 152-page Appendix, and if a single juror was excused for cause in violation of the principles enunciated in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. ed. 2d 776, 88 S. Ct. 1770, we have been unable to find it. This assignment is overruled.

Eight exceptions, collected in Group XV, relate to rulings of the trial court which defendant contends "unreasonably restricted the defendant's right to cross examine the State's witnesses to the prejudice of the defendant. This error is presented and preserved under the defendant's Exceptions Nos. 49, 50 (R p 83), 51 (R p 88), 52 (R p 89), 53 (R p 91), 54 (R p 92), 55 (R pp 92, 93), 56 (R p 93)."

[9, 10]    This ineffectual, broadside assignment does not comply with Rules 19(3) and 21, Rules of Practice in the Supreme Court, in that it does not contain any question put to any witness on cross examination. We must go beyond the assignment and discover it for ourselves. Furthermore, the record does not show what the witness would have answered had he been permitted to do so. Therefore, it is impossible for us to know whether the rulings were prej-

udicial or not. *State v. Poolos,* 241 N.C. 382, 85 S.E. 2d 342. Where the record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial. This rule applies as well to questions asked on cross examination. *State v. Maynard,* 247 N.C. 462, 101 S.E. 2d 340; *State v. Poolos, supra; State v. Jones,* 249 N.C. 134, 105 S.E. 2d 513; *State v. Peeden,* 253 N.C. 562, 117 S.E. 2d 398.

Finally, defendant moved in arrest of judgment and assigns as error the denial of his motion and the entry of judgment. No authorities are cited in the brief to support the motion.

[11-13]  "A motion in arrest of judgment is one made after verdict and to prevent entry of judgment, and is based upon the insufficiency of the indictment or some other fatal defect appearing on the face of the record." *State v. McCollum,* 216 N.C. 737, 6 S.E. 2d 503. In a criminal prosecution, however, judgment may be arrested when — and only when — some fatal error or defect appears on the face of the record proper. *State v. Higgins,* 266 N.C. 589, 146 S.E. 2d 681; *State v. Eason,* 242 N.C. 59, 86 S.E. 2d 774; *State v. Chestnutt,* 241 N.C. 401, 85 S.E. 2d 297. When based on such defect, the motion may be made at any time, even in the Supreme Court on appeal; and, in the absence of such motion, the Court *ex mero motu* will examine the record proper for such defect. *State v. Fowler,* 266 N.C. 528, 146 S.E. 2d 418; *State v. Brown,* 264 N.C. 191, 141 S.E. 2d 311; *State v. Banks,* 263 N.C. 784, 140 S.E. 2d 318; *State v. Strickland,* 243 N.C. 100, 89 S.E. 2d 781. The face of the record reveals no fatal defect; consequently, denial of the motion in arrest of judgment was proper.

[14]  Defendant's exception to the judgment presents the face of the record for review. *In Re Wallace,* 267 N.C. 204, 147 S.E. 2d 922; *Vance v. Hampton,* 256 N.C. 557, 124 S.E. 2d 527. But review is ordinarily limited to the question of whether error of law appears on the face of the record and whether the judgment is regular in form. *State v. Mallory,* 266 N.C. 31, 145 S.E. 2d 335, 18 A.L.R. 3d 1340, cert. den., 384 U.S. 928, 16 L. ed. 2d 531, 86 S. Ct. 1443. When no error appears on the face of the record proper, the judgment will be affirmed. *Seibold v. Kinston,* 268 N.C. 615, 151 S.E. 2d 654. We have searched the record for prejudicial error without success.

Defendant's failure to perfect his appeal in conformity with the rules has necessitated a judicial Easter egg hunt. No error of law appears on the face of the record proper, and our reluctant voyage

through the remainder of the record has uncovered no error which would require a new trial. The evidence of defendant's guilt is plenary and convincing. In the trial below we find

No error.

MOORE, J., took no part in the consideration or decision of this case.