Leroy Jessie **THOMAS**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–75–141.

Court of Criminal Appeals of Oklahoma.

Nov. 24, 1976.

Rehearing Denied Dec. 15, 1976.

Keith B. Aycock, Lawton, for appellant.

Larry Derryberry, Atty. Gen., Michael W. Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Leroy Jessie Thomas, hereinafter referred to as defendant, was conjointly charged with one Carl A. Swift in the Comanche County District Court, Case No. CRF–74–136, for the offense of Murder in the First Degree in violation of 21 O.S.Supp.1973, § 701.1, ¶ 2. A severance was granted to Carl Swift and the defendant was tried separately to a jury and found guilty as charged. In accordance with the provisions of 21 O.S.Supp.1973, § 701.3, the defendant was thereafter sentenced to suffer death, and, from this judgment and sentence a timely appeal has been perfected to this Court.

On the 19th of February, 1974, the badly burned body of Leon B. Jones was recovered on the top of Mt. Scott in the Wichita Wildlife Refuge in Comanche County, Oklahoma. He had been last seen on the 17th of February by fellow workers at the Marie Dettie Youth Services Center in Lawton and he failed to report for work on the 18th of February. Some partially burned remnants of a blue felt like material were found on the body and this material was later identified to be similar to material of which the victim's bed spread was made. Also, near the body the investigators found a shoe polish can, melted plastic flash light, powder container and a metal lid cover. The metal lid cover was compatible with a gasoline can found in the trunk of the victim's vehicle upon the arrest of Carl Swift in Okmulgee on the 21st of February, 1974. An investigation of the victim's residence revealed a blood-stained pillow on the divan and a blood-stained towel in the southeast bedroom. Also the victim's bed spread and his tape deck were missing, and the front door latch was broken.

An autopsy of the body established the cause of death to be a gun shot wound to the head and a bullet was recovered from the skull. Subsequent ballistics comparisons established the bullet to have been fired from the gun thich was recovered upon the arrest of Carl Swift. The same gun had been identified to have been in the defendant's possession sometime prior to the murder. Also the spent .25 caliber shell found in the victim's residence was established to have been fired from the same gun.

The evidence further established that Vicky McHenry had seen the defendant and Carl Swift, who were her friends, at the Post Oaks Apartments on Bishop Road in Lawton on the 17th of February, 1974. She and the defendant, without Swift, proceeded to the residence of her sister, Jacqueline Lee, in the Carriage Hills Apartment complex where they ate dinner. Later that evening after retiring the defendant aroused Miss McHenry and asked her to take him back to Post Oaks in her sister's car where they proceeded to pick up Swift and return to her sister's apartment. After several low tone conversations between the defendant and Swift, the substance of which she had no knowledge, the three proceeded onto Lee Boulevard to a housing project west of Lawton to a par-

ticular designated spot later determined to be one block from the victim's residence. At this time Swift and the defendant exited the car and told McHenry to "go on" and she returned to her sister's apartment arriving some 20 minutes later. When she returned the defendant and Swift were there at which time she did not know how they had returned but the defendant told her not to worry about it. Later the defendant requested McHenry to drive to the same designated spot at which time Swift again exited the car and she and the defendant drove around for a while. They returned to the designated place and picked up Swift who was carrying a large sack at that time. Thereafter they returned to her sister's apartment and went to bed. Again, early the next morning, she and this time her sister, the defendant and Swift drove to the same designated spot and again Swift exited the car and she and the defendant drove around for a while thereafter again returning to the corner picking up Swift. At this time Swift had with him a grayish coat, which defendant had worn the evening before, and a bottle of liquor, whereafter they returned to her sister's apartment and defendant picked up the sack Swift had carried the evening before and Swift and the defendant departed. Defendant said he would contact her which he did the next day by phone saying he was in Colorado. Also McHenry related that she had at some time prior to these trips pawned a gun, established as the murder weapon, and later redeemed it for the defendant at Buck's Pawn Shop. Jacqueline Lee's testimony essentially corroborated that of her sister and added that on the morning she accompanied her sister, Swift and the defendant to the housing area that Swift gave her a $100 bill and watch when he exited the car but that she gave it back to him when they returned to the corner and he got into the car.

On the 18th day of February, 1974, apparently Swift and the defendant were seen in Oklahoma City at a T. G. & Y. store where a sum of merchandise, including a pair of Georgia Giant Boots, later found in the trunk of the victim's vehicle, were purchased utilizing a charge card reflecting the victim's name. On the 19th day of February, 1974, defendant accompanied by a man, apparently Swift, purchased clothing at the Montique Clothing Store in Tulsa, Oklahoma, again utilizing the MasterCharge Card reflecting the name of the victim.

On the 18th day of February, Swift contacted an old acquaintance, Carolyn Lucille Walston, in Okmulgee and she met Swift and the defendant the next day at the Belmont Hotel. At this time she transported Swift and the defendant to their apparently stranded vehicle, later established to be the victim's vehicle, allowing a battery boost off of her car. Later she and her sister, Barbara Sloan, the defendant and Swift proceeded to Tulsa on an apparent shopping trip and upon arriving the two women went into Froug's. The defendant carried some packages as he and Swift left the Mantigue Clothing store, however, Walston did not observe any purchases being made. They returned to Okmulgee that evening and the defendant and Barbara Sloan entered a Travel Lodge and registered for a room for the defendant and Swift. The next day the group again went to Tulsa and clothing was purchased at Froug's with some type of credit card being used by the defendant. Walston on the shopping trip that day also observed a blue check book in the defendant's possession. That evening they returned to Okmulgee and ultimately proceeded to the Bel Air Motel where Mrs. Walston rented a room for the defendant and a license number was furnished to the desk clerk which was ultimately determined to be the license number off of the victim's vehicle. The next day, the 21st of February, 1974, defendant phoned Mrs. Walston requesting her to drive him to the bus station but they were later stopped by police and the defendant was arrested. Also on the 21st of February, 1974, Lonnie Franklin, a police officer in Okmulgee, assisted in effecting

the arrest of Carl Swift who was driving the victim's vehicle in Okmulgee. The officer seized from Swift a blue check book reflecting the name of Leon B. Jones and a .25 caliber automatic pistol which was later established to be the murder weapon. Also recovered was a watch similar to the one worn by the victim, a set of keys and various charge cards all reflecting the name of Leon B. Jones. One of the keys was determined to be compatible with the lock on the front door of the victim's residence.

Latent prints taken from the victim's vehicle were identified to be those of the defendant and Carl Swift. Also a piece of blood-stained padding was taken from the victim's vehicle and the analysis determined the blood to be of the same group O as had been found on the pillow and towel in the victim's residence. A tape deck, similar to the one the victim had owned, and a gasoline can were recovered from the trunk of the victim's vehicle upon its seizure in Okmulgee. The gas can also had the defendant's finger prints on it. The gas can was also similar to the one the owner of a surplus center in Lawton sold to the defendant and a companion sometime during the month of February, 1974. The defendant's grayish coat was also found at the Belmont Hotel in Okmulgee and upon discovery it had a gasoline odor.

The defendant took the stand to testify in his own behalf and stated that he had no prior record but that he had been AWOL from the Army in February of 1974. The defendant's testimony essentially established that he and Swift had gone to the victim's residence at approximately 7:00 a. m. on the morning of the 17th of February to inquire if Swift could stay at the residence. Also the defendant later saw McHenry at approximately 1:00 p. m. on that afternoon and went to McHenry's home. That evening he and McHenry went to Post Oaks and picked up Carl Swift and later proceeded to the victim's residence, noting that he stopped to call

Jones and tell him why they were coming. The defendant had Miss McHenry stop the car a block away from the victim's residence as he did not want anyone to know that he had planned on staying the night at her sister's house and he didn't want Jones to know that he was just bringing Swift just to drop him off. The defendant and Swift entered the victim's residence and the defendant, upon sitting down, heard a shot and upon turning observed Jones had been shot. Thereafter he assisted Swift in wrapping Jones' body in a bed spread and placing the body in the trunk of the victim's vehicle. He and Swift then departed in the victim's vehicle, the green Buick later recovered in Okmulgee, and subsequently purchased a shovel and a gasoline can from a surplus store. They later proceeded then to Mt. Scott in the Wichita Wildlife Refuge where the body was deposited and where Swift alone apparently burned Jones' body without the defendant's aid. Defendant testified that he did not have any knowledge of Swift's intention to kill or rob Jones and that he had stayed with Swift out of fear of his own life. He also noted that while in the victim's vehicle Swift retrieved the check book from the glove compartment.

The defense presented evidence to establish the good reputation of the defendant in the community for truth and veracity. Also evidence was presented in an attempt to establish the psychotic personality and violent nature of Carl Swift.

 The defendant's first and second assignments of error urged on appeal attack the constitutionality of the First Degree Murder Statute. See 21 O.S.1973, § 701.1, et seq. This Court has previously upheld the constitutionality of the statute however, the defendant's sentence of death under this statutory scheme cannot stand. Thus the defendant's sentence of death will be modified to life imprisonment. See, *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), and *Justus v. State,* Okl.Cr., 554 P.2d 109 (1976).

■ The defendant's third assignment of error asserts the trial court erred in instructing the jury upon the lesser included offense of Second Degree Murder. In accordance with 21 O.S.Supp.1973, § 701.3, the trial court read into the record the reason for its giving the instruction based upon the evidence at trial. The trial court essentially noted that the State attempted to prove the homicide occurred during the commission of an armed robbery by circumstantial evidence which if disbelieved by the jury could still result in the finding of guilt of premeditated murder, Murder in the Second Degree, in which the defendant could have been found to have aided and abetted. Thus an instruction upon Murder in the Second Degree was necessary. The record supports this conclusion, thus we find this assignment of error to be without merit.

■ Defendant's fourth assignment of error asserts the trial court erred in excluding prospective veniremen from the jury in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, and the Sixth and Fourteenth Amendments to the United States Constitution. A similar contention was rejected in *Jones v. State*, Okl.Cr., 555 P.2d 1061 (1970), and finding no reason to deviate therefrom, we find the defendant's fourth assignment of error to be without merit.

The defendant's fifth assignment of error essentially contends the evidence was insufficient to support the verdict of guilty. The State's evidence presented at the trial established that Jones was murdered by a gun shot wound to the head and thereafter his body was burned in an unsuccessful attempt to prevent apprehension. Later the victim's vehicle was recovered in Okmulgee upon the arrest of Swift and the defendant and Swift were connected to the vehicle by latent fingerprint comparison and the testimony of witnesses. The murder weapon was recovered upon the arrest of Swift and the murder weapon had been previously seen in the possession of the defendant. A gasoline can having the defendant's fingerprints on it and a tape deck similar to the one owned by the victim were recovered from the trunk of the victim's vehicle upon its seizure in Okmulgee. The evidence clearly establishes the possession and use of the victim's MasterCharge card by the defendant in a shopping spree apparently following the murder. The defendant's Mother and the victim had apparently dated at one time but troubles had occurred as the victim filed a lawsuit against the defendant's Mother at some time prior to the murder for $100 and the defendant had knowledge of the suit.

■ We find sufficient competent evidence in the record, although circumstantial in nature, from which the jury could properly conclude the defendant was guilty as charged. For this reason the appellate court will not interfere with the verdict, even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. See, *Stidham v. State*, Okl.Cr., 507 P.2d 1312 (1973).

The defendant's final assignment of error asserts the trial court erred in permitting the prosecuting attorney to elicit certain answers on cross-examination from a witness over the defendant's objections which essentially allowed the prosecuting attorney to effectively testify at trial. The testimony of an expert witness, Dr. O. A. Pardo, on cross-examination established a prior conversation between the prosecuting attorney and the witness during which time the witness had given the prosecuting attorney an opinion that Swift would do anything the defendant asked him to do. Defendant contends this allowed the prosecuting attorney to testify and such constitutes error.

■ Assuming arguendo that the questions propounded and the answers elicited do constitute error we cannot find that the defendant was prejudiced to afford a basis for modification or reversal.

For all of the above and foregoing reasons the defendant's sentence of death in the above styled and numbered cause is hereby MODIFIED TO LIFE IMPRISONMENT and the judgment and sentence appealed from AS SO MODIFIED IS HEREBY AFFIRMED.

BRETT, P. J., and BUSSEY, J., concur.